822 F.2d 388
 26 ERC 1193, 1987 A.M.C. 2896, 56 USLW 2016,
17 Envtl. L. Rep. 20,941
 NORFOLK SOUTHERN CORPORATION and Norfolk Southern Marine Services, Inc.
and
Lamberts Point Barge Co., Inc., Coastal Barge Corporation,
Coal Logistics Corporation and Coastal Carriers Corporation
v.
Charles M. OBERLY, III, and John E. Wilson, III, Secretary
of Department of Natural Resources and Environmental
Control, State of Delaware, Delaware Saltwater Sportfishing
Association, Inc., Kent County Levy Court, Natural Resources
Defense Council, Inc., National Audubon Society and the
Sierra Club, Intervening Defendants.
Appeal of NORFOLK SOUTHERN CORPORATION, Norfolk Southern
Marine Services, Inc., Lamberts Point Barge Company, Inc.,
Coastal Barge Corporation, Coal Logistics Corporation, and
Coastal Carriers Corporation.
 No. 86-5322.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 9, 1987.
Decided June 30, 1987.
 
 Jeffrey S. Berlin (argued), David E. Menotti, Russell E. Pommer, Mark J. Andrews, William F. Pedersen, Mark E. Martin, Donna L. Isaacks, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Washington, D.C., David S. Swayze, Duane, Morris & Heckscher, Wilmington, Del., Robert J. Katzenstein, Lassen, Smith, Katzenstein & Furlow, Wilmington, Del. A. Gayle Jordan, Norfolk Southern Corp., Norfolk, Va., for appellants.
 Fred S. Silverman, State Solicitor, Regina M. Mullen (argued), John J. Polk, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for appellees.
 Lynne T. Edgerton (argued), Sarah Chasis, Donald S. Strait, Natural Resources Defense Council, Inc., Joel B. Harris, William J.J. Cullen, Thacher Proffitt & Wood, New York City, for intervening defendants-appellees.
 Edward W. Cooch, Jr., Cooch & Taylor, Wilmington, Del., Gregory A. Inskip, Potter Anderson & Corroon, Wilmington, Del., for Delaware Wild Lands, Inc. and Delaware Nature Edu., Society, Inc. as Amici Curiae.
 David C. Slade, Coastal States Organization, Washington, D.C., for the States of Alaska, Connecticut, Florida, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, North Carolina, Oregon, South Carolina, Washington, and The Coastal States Organization as amici curiae.
 Anthony G. Flynn, Counsel to the Governor, Office of the Governor, Dover, Del., for the U.S. Congressional Delegation From The State of Delaware and the Governor of Delaware as amici curiae.
 James W. Patterson, Rubin, Quinn & Moss, Philadelphia, Pa., for Concerned U.S. Senators, Paul S. Trible, Jr. and John W. Warner, and Representatives, Frederick C. Boucher, Herbert B. Bateman, Alan B. Mollohan, Nick Joe Rahall, II, Norman Sisisky, and Harley O. Staggers, Jr. as amici curiae.
 John K. Van De Kamp, Atty. Gen. of California, N. Gregory Taylor, Asst. Atty. Gen., John A. Saurenman, Deputy Atty. Gen., Los Angeles, Cal., for the State of California acting by and through the California Coastal Com'n as amicus curiae.
 William C. Carpenter, Jr., U.S. Atty., Wilmington, Del., F. Henry Habicht II, Asst. Atty. Gen., Arthur E. Gowran, Ann S. Almy, Attorneys, Dept. of Justice, Washington, D.C., for the U.S. as amicus curiae.
 G. William Frick, James K. Jackson, Philip A. Cooney, Washington, D.C., for American Petroleum Institute as amicus curiae.
 D. Donald Jamieson, Gary L. Azorsky, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for the Delaware River Port Authority as amicus curiae.
 Before HIGGINBOTHAM and STAPLETON, Circuit Judges, and CONABOY, District Judge*.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge.
 
 
 1
 Appellants, six co-venturers seeking to initiate a coal lightering service in Delaware Bay, claim that Sec. 7003 of the Delaware Coastal Zone Act (CZA), which bans bulk product transfer facilities in Delaware's coastal zone, violates the dormant Commerce Clause. Appellees, two Delaware officials and five intervenors, argue that the federal Coastal Zone Management Act (CZMA), under which the Sec. 7003 ban has been approved, constitutes Congressional consent for the ban, immunizing it from dormant Commerce Clause scrutiny. In the alternative, appellees contend that the CZA does not offend the Commerce Clause. The district court granted summary judgment for appellees on the basis of consent. Norfolk Southern Corp. v. Oberly, 632 F.Supp. 1225 (D.Del.1986).
 
 
 2
 We hold that the CZMA does not authorize states to engage in otherwise impermissible regulation, and thus we find no consent. Appellants have failed, however, to allege any burden on interstate or international commerce cognizable in dormant Commerce Clause analysis. For this reason, we hold that Sec. 7003 of the CZA does not offend the dormant Commerce Clause and we affirm, on different grounds, the district court's order granting summary judgment to appellees.
 
 I. BACKGROUND
 
 3
 At this point in time, coal exports from the East Coast of the United States cannot be shipped in fully loaded supercolliers because the available port facilities are too shallow.[1] Appellants[2] (referred to collectively as "Norfolk Southern") seek to initiate a coal lightering, or "top-off," service at Big Stone Anchorage in Delaware Bay which would enable deep draft supercolliers to sail fully loaded. Norfolk Southern's plan envisions supercolliers being partially loaded at East Coast ports, moved to the Big Stone Anchorage, and there filled to capacity by transferring coal from Norfolk Southern's coal barges. Because coal is most cost-effectively transported overseas by fully loaded supercolliers, the top-off service would reduce average shipping costs and presumably render United States coal more competitive in overseas markets.
 
 
 4
 The Big Stone Anchorage, an area of approximately thirteen square miles in lower Delaware Bay, is critical to the Norfolk Southern project because it is the only naturally protected anchorage between Maine and Mexico that is deep enough to accommodate fully loaded supercolliers. App. at 354-55. The anchorage is now used for oil lightering, with supertankers transferring imported oil to vessels with shallower drafts for delivery to East Coast ports.[3]
 
 
 5
 The challenged law, the Delaware Coastal Zone Act, was enacted in 1971. The CZA imposed strict regulation on all new industrial activity in the coastal zone. Section 7003 of the CZA prohibits in the coastal zone all heavy industry not in operation as of June 28, 1971. This ban includes facilities such as oil refineries and steel, chemical and paper plants. 7 Del. Code Ann. Sec. 7002(c) (1983). Section 7004 provides that any other manufacturing facilities not in operation as of June 28, 1971, and any extension or expansion of nonconforming uses are allowed in the coastal zone by permit only. Most important to this case, Sec. 7003 of the CZA provides that "offshore gas, liquid, or solid bulk product transfer facilities which are not in operation on June 28, 1971, are prohibited in the coastal zone, and no permit may be issued therefor." Id. Sec. 7003 (Supp.1986).[4] The definition of bulk product transfer facilities excludes docking facilities in the port of Wilmington and docking facilities serving single industrial facilities that have been granted a permit or are nonconforming uses. Id. Sec. 7002(f) (1983). The Big Stone Anchorage is within Delaware's territorial limits and is included in the coastal zone as defined by the CZA. Id Sec. 7002(a).
 
 
 6
 In 1972, Congress enacted the Coastal Zone Management Act, which provides funding for the development and implementation of state coastal zone management plans. Pub.L. No. 92-583, 86 Stat. 1280 (1972) (codified as amended at 16 U.S.C. Secs. 1451-1464). The CZMA delegates responsibility for administering the CZMA grant-in-aid programs and, in particular, for approving state coastal management programs to the Secretary of Commerce.[5] Between 1974 and 1979, Delaware received federal funds for the development of the Delaware Coastal Management Plan (DCMP). The DCMP was approved in 1979, enabling Delaware to qualify for CZMA funding of program implementation. The DCMP was reapproved in 1980, 1982, and 1984. The DCMP states as Delaware policy that:
 
 
 7
 New offshore gas, liquid, or solid bulk product transfer facilities shall be prohibited in the coastal strip. Such facilities are docks or port facilities, whether artificial islands or attached to shore by any means, for transfer of bulk quantities of any substance from vessel to onshore facility or vice versa. However, a docking facility or pier for a single industrial or manufacturing facility and docking facilities located in the City of Wilmington for the port of Wilmington, shall not be prohibited.
 
 
 8
 App. at 557. The CZA is the legal authority relied upon to support this DCMP policy. App. at 558.
 
 
 9
 In 1983, the Coast Guard, with jurisdiction over navigational safety, redesignated the Big Stone Anchorage as a "general anchorage," a designation that permits coal lightering. 48 Fed.Reg. 23,636-37 (May 26, 1983). Prior to that time, use of the Big Stone Anchorage was limited to tanker lightering. The redesignation was promulgated in response to requests by the Delaware River Port Authority and the Delaware River and Bay Authority, and the main reason for their requests was to permit use of the anchorage to top-off deep draft colliers. The redesignation was objected to on the basis of environmental concerns by the State of Delaware. 48 Fed.Reg. at 23,637 (May 26, 1983).
 
 
 10
 In 1984, Norfolk Southern sought a formal determination of whether coal lightering was banned by Sec. 7003 of the CZA. The Delaware Department of Natural Resources and Environmental Conservation (DNREC) concluded that the proposed top-off service was not a "bulk product transfer facility" and thus was not barred by Sec. 7003 of the CZA. This decision was appealed to the Coastal Zone Industrial Control Board, which reversed the Secretary and found that the project was barred. The Superior Court and then the Supreme Court upheld the Board's decision. Coastal Barge Corp. v. Coastal Zone Industrial Control Board, 492 A.2d 1242 (Del.1985).
 
 
 11
 Norfolk Southern filed suit in federal district court, seeking a declaration that the CZA was unconstitutional as applied to its coal lightering proposal and an injunction against state enforcement of Sec. 7003 against Norfolk Southern. The defendants were Delaware Attorney General Oberly and Secretary Wilson of the DNREC (referred to collectively as "the State"). Five parties intervened as defendants[6] (referred to as "intervenors"). Norfolk Southern claimed that the CZA, as applied to its project, violated the dormant Commerce Clause. The State and intervenors argued that the CZA ban on bulk product transfer facilities was immunized from dormant Commerce Clause review because it was part of the coastal management program that had been approved under the CZMA. Alternatively, they argued that the CZA did not offend the Commerce Clause. After discovery, both sides moved for summary judgment.
 
 
 12
 Chief Judge Schwartz denied summary judgment to both Norfolk Southern and appellees on dormant Commerce Clause grounds because he found that there were disputed issues of material fact relating to: 1) the purpose of the Delaware legislature in enacting the bulk product transfer facility ban, 632 F.Supp. at 1238, 2) the economic impacts of banning this project, id. at 1242, and 3) the environmental impacts of going forward with the project. Id. at 1243. The court found, however, that Congress, through the CZMA and the Secretary's approval of the DCMP, had consented to the CZA and thus the CZA was immune from Commerce Clause scrutiny. On this basis, summary judgment was granted to defendants. This appeal followed.
 
 II. CONGRESSIONAL CONSENT
 
 13
 "The Commerce Clause grants to Congress the power '[t]o regulate Commerce ... among the several States.' U.S. Const., Art. 1, Sec. 8, cl. 3. Although the Clause thus speaks in terms of powers bestowed upon Congress, the [Supreme] Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). The dormant Commerce Clause, as the term "dormant" implies, limits the powers of the states in areas where Congress has not affirmatively acted to either authorize or forbid the challenged state activity.
 
 
 14
 One defense to a dormant Commerce Clause challenge is Congressional consent. By its actions, "Congress may 'redefine the distribution of power over interstate commerce' by 'permit[ting] the states to regulate the commerce in a manner which would otherwise not be permissible.' " South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 87-88, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984) (quoting Southern Pacific Co. v. Arizona, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed.2d 1915 (1945)). Thus, the limitations on state authority created by the Commerce Clause cannot be ascertained without reference to the relevant federal law.
 
 
 15
 The Supreme Court has found consent only where Congress has "affirmatively contemplate[d] otherwise invalid state legislation," South-Central Timber, 467 U.S. at 91-92, 104 S.Ct. at 2242, and "[w]here state or local government action is specifically authorized by Congress." White v. Massachusetts Council of Construction Employers, Inc., 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983). "[F]or a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." South-Central Timber, 467 U.S. at 91, 104 S.Ct. at 2242. "[W]hen Congress has not 'expressly stated its intent and policy' to sustain state legislation from attack under the Commerce Clause, Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 427, 431, 66 S.Ct. 1142, 1153, 1155, 90 L.Ed.2d 1342 (1946), we have no authority to rewrite its legislation based on mere speculation as to what Congress 'probably had in mind.' " New England Power Co. v. New Hampshire, 455 U.S. 331, 343, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982).
 
 
 16
 Appellees urge that consent for the Sec. 7003 ban on offshore bulk product transfer facilities, which, as an element of the DCMP, has been approved by the Secretary of Commerce, can be found in the CZMA. Appellees acknowledge that any consent found in the CZMA is conditioned on Secretarial approval. While the existence of conditions subsequent may add a step to our consent analysis by requiring the court to determine whether the conditions were indeed satisfied, it does not fundamentally alter our analysis of Congressional intent. Congressional intent, whether conditional or unconditional, must be unambiguous.[7]
 
 
 17
 The burden of presenting unambiguous evidence of Congressional intent falls on the parties claiming consent. We look first to the text of the CZMA and the legislative history, and then consider the gloss provided by the case law.
 
 A. The CZMA
 
 18
 The Coastal Zone Management Act's statements of findings and purpose suggest that Congress did not intend to authorize expansion of state powers. Congress found that the coastal zone was an important environmental resource which faced enormous development pressures, and that the existing system of local land use regulation was inadequate to protect coastal resources.
 
 
 19
 The key to more effective protection and use of the land and water resources of the coastal zone is to encourage the states to exercise their full authority over the lands and waters in the coastal zone by assisting the states ... in developing land and water use programs for the coastal zone, including unified policies, criteria, standards, methods, and processes for dealing with land and water use decisions of more than local significance.
 
 
 20
 16 U.S.C. Sec. 1451(i) (1982) (emphasis added). Congress' specific purpose in enacting the CZMA was
 
 
 21
 to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone, giving full consideration to ecological, cultural, historic, and esthetic values as well as to needs for economic development....
 
 
 22
 16 U.S.C. Sec. 1452(2) (1982) (emphasis added). The goal of the CZMA was thus to provide financial incentives for states to centralize coastal land use regulation functions at the state level.
 
 
 23
 The CZMA is primarily a grant-in-aid statute. Section 1454 authorizes the Secretary of Commerce to make grants to states for the development of coastal zone management programs. Section 1455 authorizes the Secretary to make grants for the administration of approved programs and sets out the standards for program approval.[8] State development and implementation of coastal zone management programs is voluntary.[9]
 
 
 24
 The only section of the CZMA that specifically addresses the distribution of power between the state and federal governments provides:
 
 
 25
 Nothing in this chapter shall be construed--(1) to diminish either Federal or state jurisdiction, responsibility, or rights in the field of planning, development, or control of water resources, submerged lands, or navigable waters....
 
 
 26
 16 U.S.C. Sec. 1456(e) (1982). This section is designed primarily to ensure that the CZMA does not preempt pre-existing state authority to legislate in these areas. S.Rep. No. 753, 92d Cong., 2d Sess. 19 (1972), reprinted in 1972 U.S.Code Cong. & Admin.News 4776, 4794 (describing Sec. 1456(e)(1) as "a standard clause disclaiming intent to diminish Federal or State authority in the fields affected by the Act"). However, the statement that the CZMA was not intended to diminish Federal jurisdiction strongly suggests that the CZMA was not intended to transfer Commerce Clause authority from Congress to the states.[10] H.R.Conf.Rep. No. 1544, 92d Cong., 2d Sess. 15, reprinted in 1972 U.S.Code Cong. & Admin.News 4822, 4824 ("there is no intent in this legislation to change Federal or state jurisdiction or rights"); see California Coastal Comm'n v. Granite Rock Co., --- U.S. ----, 107 S.Ct. 1419, 1431, 94 L.Ed.2d 577 (1987) (in preemption analysis, Court found that Sec. 1456(e)(1) "and its legislative history demonstrate Congress' refusal to use the CZMA to alter the balance between state and federal jurisdiction").[11] The Supreme Court has held that a similar non-preemption provision did not immunize preexisting state laws from Commerce Clause scrutiny. New England Power Co. v. New Hampshire, 455 U.S. 331, 341, 102 S.Ct. 1096, 1101, 71 L.Ed.2d 188 (1982).
 
 
 27
 The text of the CZMA indicates that Congress was very concerned about environmental degradation of the nation's coastal resources and the failure of the local land use regulators to adequately protect those resources. Responding to these concerns, Congress enacted a grant-in-aid statute that provided financial encouragement for state development and implementation of centralized state coastal management plans. While the CZMA states a national policy in favor of coastal zone management, it does not on its face expand state authority to legislate in ways that would otherwise be invalid under the Commerce Clause.
 
 B. Legislative History
 
 28
 The CZMA's legislative history reinforces the conclusion that Congress viewed the CZMA as a grant-in-aid statute intended to encourage and assist states in the task of developing and implementing statewide coastal zone management programs. The first page of the Senate Report states:
 
 
 29
 S. 3507 has as its main purpose the encouragement and assistance of States in preparing and implementing management programs to preserve, protect, develop, and whenever possible restore the resources of the coastal zone of the United States. The bill authorizes Federal grants-in-aid to coastal States to develop coastal zone management programs. Additionally, it authorizes grants to help coastal States implement these management programs once approved, and States would be aided in the acquisition and operation of estuarine sanctuaries. Through the system of providing grants-in-aid, the States are provided financial incentives to undertake the responsibility for setting up management programs in the coastal zone. There is no attempt to diminish State authority through Federal preemption. The intent of this legislation is to enhance State authority by encouraging and assisting the States to assume planning and regulatory powers over their coastal zones.
 
 
 30
 S.Rep. No. 753, 92d Cong., 2d Sess. 1, reprinted in 1972 U.S.Code Cong. & Admin.News 4776, 4776. The Senate Report further states that the States have sufficient constitutional authority to implement coastal zone management programs, id. at 5, reprinted in 1972 U.S.Code Cong. & Admin.News at 4780 ("It is believed that the States do have the resources, administrative machinery, enforcement powers, and constitutional authority on which to build a sound coastal zone management program."), implying that the CZMA was not an attempt to broaden such powers.
 
 
 31
 Both sides rely on a portion of a House Report that discusses the factors the Secretary of Commerce must consider before approving a state program for Sec. 1455 administrative funding. The CZMA conditions program approval on a finding that the candidate program "provides for adequate consideration of the national interest involved in planning for, and in the siting of, facilities," such as energy facilities, "which are necessary to meet requirements which are other than local in nature." 16 U.S.C. Sec. 1455(c)(8) (1982). In discussing this requirement, the House Committee stated:
 
 
 32
 As to the national interest requirements referred to under item 8, your committee wishes to make it clear that the primary responsibility for developing the State program remains in the State. Nevertheless, if the program as developed is to be approved and thereby enable the State to receive funding assistance under this title, the State must take into account and must accommodate its program to the specific requirements of various Federal laws which are applicable to its coastal zone. It must also recognize that there is no provision of this title which relinquishes any Federal rights in and powers of regulation of Federal lands, or of the paramount Federal interests in navigable waters, or of any of the constitutional powers of the Federal Government, including those relating to interstate and foreign commerce, navigation, national defense, and international affairs. To the extent that a State program does not recognize these overall national interests, as well as the specific national interest in the generation and distribution of electric energy, adequate transportation facilities, and other public services, or is construed as conflicting with any applicable statute, the Secretary may not approve the State program until it is amended to recognize those Federal rights, powers, and interests.
 
 
 33
 H.R.Rep. No. 1049, 92d Cong., 2d Sess. 17-18, reprinted in Senate Comm. on Commerce, 94th Cong., 2d Sess., Legislative History of the Coastal Zone Management Act of 1972, as Amended in 1974 and 1976, at 305, 321-22. This passage plainly supports the conclusion that provisions for facility planning in state management programs approved under the CZMA are to be consistent with the dormant Commerce Clause. The Report's direction to the Secretary that a candidate program may not be approved if it does not recognize the "constitutional powers of the Federal Government ... relating to interstate and foreign commerce" is fundamentally at odds with appellees' assertion that Congress intended the CZMA to authorize the Secretary to consent to state measures that disregard the limitations of the dormant Commerce Clause.[12]
 
 
 34
 The legislative history does not convey an "unmistakably clear" Congressional intent to confer added authority on the states.
 
 C. Case Law
 
 35
 The State contends that "Congress clearly demonstrated that it intended to remove from Commerce Clause scrutiny state coastal zone management programs approved under the Act." State Br. at 30. With the benefit of a substantial body of Supreme Court case law concerning consent, we reject this argument. The Supreme Court has found consent where Congress has affirmatively authorized states to control specific aspects of interstate commerce, e.g., Northeast Bancorp, Inc. v. Federal Reserve System, 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985) (federal law authorized states to decide whether to allow in-state banks to be purchased by out-of-state bank holding companies), and where Congress has specifically excepted an area of state commerce regulation from Commerce Clause review. E.g., Western & Southern Life Insurance Co. v. State Board of Equalization of California, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) (federal law allowed state regulation of the business of insurance and stated that "silence on the part of the Congress shall not be construed to impose a barrier" on state regulation). The Court has refused to find consent, however, where intent to consent is not so clear. Showing that a challenged state law is consistent with a federal policy that discriminates between states is not a sufficient basis for finding consent. See South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 88-93, 104 S.Ct. 2237, 2240-43, 81 L.Ed.2d 71 (1984) (Alaska rule requiring that timber cut from state-owned forests must be processed in Alaska is not immunized from Commerce Clause review on the basis that there is a U.S. Department of Agriculture rule regulating the export and interstate shipment of unprocessed timber cut from National Forests in Alaska). A fortiori, consistency with a general federal policy that is not inherently discriminatory is not a basis for finding consent. See Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 2448-49, 91 L.Ed.2d 110 (1986) (Congressional encouragement for state protection of endangered species does not aid state in Commerce Clause challenge to discriminatory state action undertaken to protect endangered species). Nor is it sufficient to show that Congress has deferred to state law rather than establishing an area of federal law. Sporhose v. Nebraska, 458 U.S. 941, 959-60, 102 S.Ct. 3456, 3465-66, 73 L.Ed.2d 1254 (1982) (Congressional deference to state water law does not confer consent on discriminatory state water law). As discussed above, there is no indication in the statute or the legislative history that Congress intended to transfer any federal power to the states. To the contrary, the evidence demonstrates that Congress intended to encourage the states to use their existing powers more effectively.
 
 
 36
 Appellees argue that federal funding establishes consent, relying upon White v. Massachusetts Council of Construction Employers, Inc., 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). White does not support appellee's broad assertion. In White, the Court upheld an executive order by the Mayor of Boston requiring that construction projects receiving federal funds distributed by the City must use a work force consisting of at least one-half Boston residents. After stating that such discrimination is valid if "specifically authorized by Congress," id. at 213, 103 S.Ct. at 1047, the Court found consent in the federal statutes authorizing economic development grants, which were intended to stimulate economic revitalization in the recipient target areas, and in the implementing regulations, which specifically authorized the parochial hiring preferences. It is unclear whether White liberalizes consent analysis. See South-Central Timber, 467 U.S. at 91, 104 S.Ct. at 2242 (rejecting an argument, based on White, that consent can be implied from a parallel federal policy; reaffirming that "for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear"). But in any case, White is distinguishable from the present situation. In White, the Court relied on federal regulations that explicitly required funding recipients to institute local hiring preferences. 460 U.S. at 213 n. 11, 103 S.Ct. at 1047-48 n. 11. Appellees point to no comparable Department of Commerce regulations authorizing otherwise invalid actions by CZMA funding recipients. White did not go so far as to suggest that the mere making of federal grants was authorization for any parochial state action that might arise in the use of those funds. The federal statutes at issue in White are also distinguishable from the CZMA. Local economic development grants carry inherent geographical preferences for the recipient, and, as the Court found, Congress intended these economic development benefits to include reduction of unemployment. In addition, Congress explicitly mandated local hiring preferences under two of the three grant programs at issue.[13] In contrast, there is no inherent connection between funding state coastal zone management programs and authorizing regulation by recipient states that would otherwise offend the dormant Commerce Clause.[14]
 
 
 37
 Appellees argue, and the district court found, that Congress, in enacting the CZMA, "intended the states to resolve choices among competing uses in a manner that might otherwise be subject to Commerce Clause challenge." 632 F.Supp. at 1248. We agree that the CZMA left the difficult choices between environmental and development concerns to the states, but we do not find any evidence that Congress intended to sanction resolutions that would otherwise be unconstitutional. The Supreme Court has found Congressional consent only where Congress "affirmatively contemplate[d] otherwise invalid state legislation." South-Central Timber, 467 U.S. at 91-92, 104 S.Ct. at 2242 (emphasis added). Congress contemplated that states, in response to the incentives of the CZMA, would engage in regulation of development activities, and that such regulation would inevitably impose costs on commercial activities. From this premise, appellees conclude that Congress necessarily consented to state legislation that would otherwise violate the dormant Commerce Clause. This logic fails, however, because appellees incorrectly assume that all state actions which impose costs on or otherwise affect interstate and international commerce are constitutionally invalid. The scope of the dormant Commerce Clause is much narrower. In general terms, the Supreme Court has invalidated under the dormant Commerce Clause state laws falling into three categories: 1) laws that purposefully or arbitrarily discriminate against interstate commerce in favor of in-state interests, Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 2453 & n. 19, 91 L.Ed.2d 110 (1986); 2) laws that impose incidental burdens on interstate and foreign commerce that are clearly excessive in comparison to the putative local benefits, Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471, 101 S.Ct. 715, 727-28, 66 L.Ed.2d 659 (1981); and 3) laws that undermine the federal need for uniformity among the states in particular areas, such as foreign trade and interstate transportation. Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 448, 99 S.Ct. 1813, 1821, 60 L.Ed.2d 336 (1979); Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 526-27, 79 S.Ct. 962, 966, 3 L.Ed.2d 1003 (1959). Appellees point to no evidence that Congress affirmatively contemplated state action in response to the CZMA that would fall into any of these three categories. Congress may well have contemplated, for example, that Delaware would ban industrial activity in areas of the coastal zone reserved for fishing. We doubt, however, that Congress intended to authorize Delaware to reserve its fishing areas for use by Delaware residents only.
 
 
 38
 Appellees also press the argument that the Congressional purpose of encouraging state land use regulation in the coastal zone would be undermined if such regulation had to be promulgated in accordance with the limitations of the dormant Commerce Clause. The district court found that a failure to find consent would render the CZMA a "nullity." 632 F.Supp. at 1248. Appellees' argument is based on the same false premise discussed above, namely that all state regulation that affects the flow of commerce or imposes costs on out-of-state commercial interests is unconstitutional absent consent. The CZMA's purposes can be achieved without purposefully discriminating against out-of-state commercial interests, incidentally discriminating in a manner clearly unjustified by the local benefits, or impinging on special federal interests in uniformity.
 
 
 39
 We find that Congress did not intend the CZMA " 'to alter the limits of state power otherwise imposed by the Commerce Clause' " in any manner relevant to this case. New England Power Co. v. New Hampshire, 455 U.S. at 341, 102 S.Ct. at 1102 (1982) (quoting United States v. Public Utilities Comm'n of California, 345 U.S. 295, 304, 73 S.Ct. 706, 712, 97 L.Ed.2d 1020 (1953)). Given that "for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear," South-Central Timber, 467 U.S. at 91, 104 S.Ct. at 2242, we hold that the approval of the DCMP by the Secretary of Commerce under the CZMA did not confer Congressional consent to any otherwise invalid regulatory provisions of the CZA.[15]
 
 III. STANDARD OF COMMERCE CLAUSE REVIEW
 
 40
 Three standards of review are applied in performing dormant Commerce Clause analysis: 1) state actions that purposefully or arbitrarily discriminate against interstate commerce or undermine uniformity in areas of of particular federal importance are given heightened scrutiny; 2) legislation in areas of peculiarly strong state interest is subject to very deferential review; and 3) the remaining cases are governed by a balancing rule, under which state law is invalid only if the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits. Norfolk Southern argues for heightened scrutiny and appellees argue for the very deferential standard, but we conclude that the balancing approach is appropriate here.
 
 
 41
 A. Values Underlying the Dormant Commerce Clause
 
 
 42
 In considering dormant Commerce Clause challenges, "it is the responsibility of the judiciary to determine whether action taken by state or local authorities unduly threatens the values the Commerce Clause was intended to serve." Wardair Canada, Inc. v. Florida Dep't of Revenue, 477 U.S. 1, 106 S.Ct. 2369, 2372-73, 91 L.Ed.2d 1 (1986). Thus, our selection and subsequent application of a standard of Commerce Clause review must be informed by the values underlying the Commerce Clause.[16]
 
 
 43
 The primary purpose of the Commerce Clause was to ensure that "our economic unit is the Nation," H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 537, 69 S.Ct. 657, 665, 93 L.Ed.2d 865 (1949), rather than individual states.
 
 
 44
 The few simple words of the Commerce Clause--"The Congress shall have Power ... To regulate Commerce ... among the several States ..."--reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.
 
 
 45
 Hughes v. Oklahoma, 441 U.S. 322, 325-26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). See Wardair Canada, 106 S.Ct. at 2375 (the dormant Commerce Clause operates "to ensure that the essential attributes of nationhood will not be jeopardized by States acting as independent economic actors"); Baldwin v. GAF Seelig, 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed.2d 1032 (1935) ("one state ... may not place itself in a position of economic isolation"). Thus, the Commerce Clause is designed to eliminate protectionist restrictions on interstate trade which typically characterize international trade, such as embargoes, quotas, and tariffs.
 
 
 46
 The Commerce Clause also serves the need of ensuring uniformity among the states in the area of foreign trade:
 
 
 47
 In the unique context of foreign commerce, we have alluded to the special need for federal uniformity: " 'In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.' Board of Trustees v. United States, 289 U.S. 48, 59 [53 S.Ct. 509, 510, 77 L.Ed. 1025] (1933)" Japan Line, 441 U.S., at 448, 99 S.Ct., at 1821. As in the context of cases alleging violations of the dormant interstate Commerce Clause, the concern in these Foreign Commerce Clause cases is not with an actual conflict between state and federal law, but rather with the policy of uniformity, embodied in the Commerce Clause, which presumptively prevails when the Federal Government has remained silent.
 
 
 48
 Wardair Canada, 106 S.Ct. at 2373.
 
 
 49
 The Supreme Court has recognized a similar Commerce Clause interest in federal uniformity in cases addressing state regulation of the means of interstate transportation. In particular, the Court has guarded the federal interest in avoiding contradictory and inconsistent state regulation of vehicles engaged in interstate transportation. See Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 526, 79 S.Ct. 962, 966, 3 L.Ed.2d 1003 (1959) (invalidating Illinois standard for truck mud flaps which conflicted with the standards of other states); Southern Pacific Co. v. Arizona, 325 U.S. 761, 779, 65 S.Ct. 1515, 1525, 89 L.Ed.2d 1915 (1945) (invalidating Arizona train length limit that was inconsistent with limits of adjacent states).
 
 B. Heightened Scrutiny
 
 50
 Norfolk Southern argues that the CZA ban on vessel-to-vessel bulk product transfers discriminates against interstate commerce and is thus subject to "strictest scrutiny," Hughes v. Oklahoma, 441 U.S. at 337, 99 S.Ct. at 1737, with "the burden fall[ing] upon the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 2448, 91 L.Ed.2d 110 (1986) (quoting Hughes v. Oklahoma, 441 U.S. at 336, 99 S.Ct. at 1736). Alternatively, Norfolk Southern argues that "rigorous and searching scrutiny" should be applied because the CZA "burden[s] foreign commerce." South-Central Timber, 467 U.S. at 100, 104 S.Ct. at 2247.[17] In practice, such heightened scrutiny is applied with considerable rigor and turns out to be "a virtually per se rule of invalidity." Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).
 
 1. Economic Protectionism
 
 51
 Heightened scrutiny is the standard of review for "simple economic protectionism." Id. at 624, 98 S.Ct. at 2535. The category of protectionism includes those state measures that discriminate on their face against out-of-state interests or in favor of in-state interests. See Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). It also includes state measures that, while neutral on their face, have been found to have been motivated by a "discriminatory purpose." Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270, 104 S.Ct. 3049, 3054, 82 L.Ed.2d 200 (1984). Finally, "economic protectionism" triggering heightened scrutiny has been found in two cases where the challenged measure was facially nondiscriminatory but was found to have "discriminatory effect." Id. at 270, 104 S.Ct. at 3054; Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). We acknowledge having some difficulty in harmonizing the analysis of "discriminatory effect" in these two cases with the Court's analysis of similar effects in the "incidental burden" cases we will discuss hereafter. However, in Bacchus the stated legislative purpose was protectionist and in Hunt the Court found that the protectionist means selected did not serve the nonprotectionist purpose cited by the legislature and there was other strong evidence of protectionist intent. As a result, until we receive further guidance from the Supreme Court, we believe the "discriminatory effect" cases are best regarded as cases of purposeful discrimination.[18] See Minnesota v. Clover Leaf Creamery Co., 449 U.S. at 471 n. 15, 101 S.Ct. at 727 n. 15 (citing Hunt as an example of a discriminatory purpose case).
 
 
 52
 In this case, Norfolk Southern concedes that the CZA is facially neutral. Its first argument is that "Delaware's prohibition of vessel to vessel coal lightering blocks the flow of commerce at the state's borders," Norfolk Southern Br. at 34, and that this is the kind of discriminatory effect that calls for heightened scrutiny. The short answer is that the CZA does not prohibit the export, import, or transshipment of coal, and thus does not have the effect of blocking the flow of coal at Delaware's borders. Even if it did, however, Norfolk Southern's argument would be unpersuasive. While it is true that the Supreme Court has held that heightened scrutiny applies where the challenged statute "overtly blocks the flow of interstate commerce at a State's borders," Philadelphia v. New Jersey, 437 U.S. at 624, 98 S.Ct. at 2535, in each such instance the Court was confronted with a state law that imposed an import or export embargo which precluded interstate commerce in a specified good while leaving unaffected the in-state trade in that good. E.g., Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (precluding out-of-state trash from being disposed of in New Jersey landfills, but not similarly restricting disposal of New Jersey trash); Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (barring export for sale of Oklahoma minnows but allowing in-state sales). It is the discrimination against interstate versus intrastate movements of goods, rather than the "blockage" of the interstate flow per se, that triggers heightened scrutiny review in such cases. This point is made most clearly in Philadelphia v. New Jersey in which the Court indicated that New Jersey could not stem the depletion of landfill capacity by excluding out-of-state trash, but that it could pursue that interest by slowing the flow into its landfills of all wastes, whether generated locally or out of state, even though that would impede the flow of waste from other states across its border. 437 U.S. at 626, 98 S.Ct. at 2536. See also CTS Corp. v. Dynamics Corp. of America, --- U.S. ----, 107 S.Ct. 1637, 1652, 95 L.Ed.2d 67 (1987) (evenhanded statute reducing number of interstate transactions is not invalid). Section 7003 of the CZA simply bears no resemblance to the statutes invalidated in these embargo cases. Rather than discriminatorily prohibiting interstate commerce in a certain good, the CZA regulates an in-state activity--vessel-to-vessel coal transfers--in a wholly nondiscriminatory manner.
 
 
 53
 While Norfolk Southern does not suggest that the CZA bestows a competitive advantage on Delaware coal exporters, it argues that the statute is protectionist, and thus subject to heightened scrutiny, because it favors those uses, like tourism and fishing, which produce economic benefits for Delaware over "competing" uses of the Bay, like lightering, which allegedly add little or nothing to the Delaware economy.[19] In addition to barring coal lightering, Sec. 7003 bars many kinds of heavy industries, with their concomitant economic benefits, from locating in the coastal zone. On this basis alone, there is no apparent support for Norfolk Southern's assertion that the CZA is a disguised form of preference for the most economically beneficial industries. But even if we accept the factual premise that the CZA systematically discriminates between various industries on the basis of their economic contribution to Delaware, Norfolk Southern's argument fails. The Supreme Court has never adopted such a broad gauged view of a discriminatory effect; it has found facially evenhanded legislation to have discriminatory effects only where the state law advantages in-state business in relation to out-of-state business in the same market. See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383; Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200. A state's choice between competing land uses or between alternative environmental protection policies does not implicate the Commerce Clause simply because the alternative chosen may be in the best economic interests of the state so long as the state's choice does not discriminate between in-state and out-of-state competitors. See Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 448, 80 S.Ct. 813, 814-15, 4 L.Ed.2d 852 (1960); Minnesota v. Clover Leaf Creamery Co., 449 U.S. at 473, 101 S.Ct. at 728.
 
 
 54
 In a related argument, Norfolk Southern contends, relying on Maine v. Taylor, 106 S.Ct. at 2453 n. 19, that discriminatory effects are not limited to relative advantages for in-state participants in a particular market but also include situations in which out-of-state residents "bear the brunt" of state action "for no apparent reason other than that they live and voted in other states." As indicated above, we are not persuaded that out-of-state interests bear the brunt of the Sec. 7003 ban; the only evidence offered by Norfolk Southern is that its particular project was barred and that it does not have Delaware connections. But even assuming that out-of-state interests currently bear the brunt of the CZA regulation, there is no legal basis for finding discriminatory effect on that basis alone. Norfolk Southern misreads Maine v. Taylor; the quoted footnote does not hold that discriminatory effect means simply that out-of-state interests bear the brunt of state action.[20] Moreover, showing that out-of-state firms happen to be the only ones currently interested in engaging in activity foreclosed by facially evenhanded state regulation has not by itself been held to trigger heightened scrutiny. In Exxon Corp. v. Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), for example, a Maryland statute barred petroleum producers and refiners from operating retail gas stations in the state. Since there were no petroleum producers or refiners based in Maryland at the time the statute was enacted, its initial impact was felt only by out-of-state firms. As the Court noted, however, "this fact does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce." 437 U.S. at 125, 98 S.Ct. at 2214. See also Commonwealth Edison Co. v. Montana, 453 U.S. 609, 619, 101 S.Ct. 2946, 2954, 69 L.Ed.2d 884 (1981) (claim of discrimination based on fact that evenhanded tax on coal fell largely on out-of-state coal purchasers rejected). Thus, we agree with the district court that Norfolk Southern has not alleged any discriminatory effects that would justify the application of heightened scrutiny.
 
 
 55
 Alternatively, Norfolk Southern argues that heightened scrutiny is appropriate because, when given the opportunity to produce evidence, it will demonstrate that the Delaware General Assembly had a discriminatory purpose. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. at 471 n. 15, 101 S.Ct. at 727 n. 15 (discriminatory purpose is a basis for finding protectionism). The defendants have moved for summary judgment, however, and Norfolk Southern is not entitled to an evidential hearing unless it has shown some reason to believe the statute is tainted by a constitutionally illegitimate purpose. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 
 56
 When choosing the applicable Commerce Clause standard of review, a court "assume[s] that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [it] to conclude that they 'could not have been a goal of the legislation.' " Clover Leaf Creamery, 449 U.S. at 463 n. 7, 471 n. 15, 101 S.Ct. at 723 n. 7, 727 n. 15 (quoting from Weinberger v. Wiesenfeld, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975).[21]
 
 
 57
 The declared purpose of the CZA is to protect the coastal environment. The Act explains that it restricts industrial development in the coastal zone so "the State can better protect the natural environment of its bay and coastal areas and safeguard their use primarily for recreation and tourism." 7 Del.Code Ann. Sec. 7001 (1983).[22] With regard to the ban on offshore bulk product transfer facilities, the Delaware legislature found that:
 
 
 58
 offshore bulk product transfer facilities represent a significant danger of pollution to the coastal zone and generate pressure for the construction of industrial plants in the coastal zone, which construction is declared to be against public policy. For these reasons, prohibition against bulk product transfer facilities in the coastal zone is deemed imperative.
 
 
 59
 Id.
 
 
 60
 Norfolk Southern points to no circumstances that lead us to conclude that the stated environmental objectives "could not have been a goal of the legislation." Contrary to its suggestion, the statutory exemptions do not call the Act's declared purpose into question. Those exemptions are quite narrow in the context of the ban on heavy industrial uses in the coastal zone and each clearly has a justification unrelated to economic protection for local commercial interests. In particular, the only two exemptions from the ban on bulk product transfer facilities--existing uses as of June 28, 1971, and the Port of Wilmington--cannot be said to be protectionist in purpose or effect. Grandfather clauses which distinguish between new and preexisting operations are common vehicles for avoiding hardship to those who have invested in reliance upon the prior law.[23] The exemption for the Port of Wilmington concentrates development in an already developed area, and discriminates between particular areas in the Delaware coastal zone, not between potential users of those areas. Accordingly, nothing about the Act's exemptions renders implausible the legislature's explanation that the ban on bulk transfer was enacted to protect the coastal environment against pollution and development pressures.[24] Since Norfolk Southern has shown no basis for doubting the declared purpose of Sec. 7003, heightened scrutiny review based on discriminatory purpose is inappropriate.
 
 2. Foreign Commerce
 
 61
 Norfolk Southern alternatively argues that heightened scrutiny should be applied because Sec. 7003 burdens foreign commerce. It is "well-accepted" that "state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny." South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. at 100, 104 S.Ct. at 2247. The judicial rationale underlying this elevated scrutiny is the need for uniformity among the several states in regulating foreign trade. " '[S]peaking with one voice' in regulating foreign commerce" is necessary in order to avoid international trade disputes and trade retaliation that might arise from state regulation of foreign trade. Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 450-51, 99 S.Ct. 1813, 1823, 60 L.Ed.2d 336 (1979).
 
 
 62
 In claiming that the CZA burdens foreign commerce, Northern Southern misconceives the term "burden" as it is used in Commerce Clause analysis, suggesting that any state action adversely affecting foreign commerce burdens such commerce sufficiently to invoke heightened scrutiny. Burden on foreign commerce is weighed in terms of the relevant goal of the dormant Commerce Clause, that is, limiting the power of state governments to act in ways that threaten the federal union's interest in uniform trade policies. Wardair Canada, Inc. v. Florida Dep't of Revenue, 477 U.S. 1, 106 S.Ct. 2369, 2373, 91 L.Ed.2d 1 (1986).
 
 
 63
 While we acknowledge that the courts often use the term "burden on commerce" in a much more general sense to mean affecting the flow of commerce, not every burden on commerce in this general sense is relevant to foreign Commerce Clause analysis. Virtually all regulation in the state of origin of goods ultimately shipped in foreign commerce affects the cost of those goods and, accordingly, the quantity sold abroad. If such effects were sufficient to trigger Commerce Clause review under the heightened scrutiny standard, however, the Commerce Clause would become a far more restrictive limit on state legislative power than it has traditionally been. In this case, for example, Norfolk Southern claims that the CZA ban on coal lightering affects foreign commerce by preventing Norfolk Southern from reducing transportation costs and thereby increasing coal exports. In much the same way, West Virginia regulation of coal mine operations affects delivered coal costs and thereby acts to decrease exports. Subjecting all such laws to rigorous scrutiny is clearly overinclusive given the limited federal interest of uniformity served by the foreign Commerce Clause. Thus, we hold that the relevant burden on foreign commerce is the degree to which the state law impinges on the need for federal uniformity in the area of foreign trade policy.
 
 
 64
 The CZA does not manipulate the terms of international trade for the state's economic benefit by imposing embargoes, quotas, or tariffs. Compare South-Central Timber, 467 U.S. at 99-101, 104 S.Ct. at 2246-47 (embargo on export of unprocessed logs cut from state-owned forests, which benefitted in-state timber processors, invalidated). Nor has Norfolk Southern claimed that heightened scrutiny is independently justified by a threat that the CZA will prevent the nation from speaking with one voice in regulating foreign commerce. Compare Japan Line, 441 U.S. at 444-54, 99 S.Ct. at 1819-1824 (invalidating application of local property tax to foreign-owned shipping containers because the potential for double taxation, contrary to international trade agreements, would undermine the need for federal uniformity in international trade policy). Thus, we find no cognizable burden on foreign commerce and we decline to impose heightened scrutiny of foreign commerce grounds.
 
 C. Deferential Review
 
 65
 Appellees assert that land use and environmental regulations are matters of peculiarly local interest and that courts, accordingly, should accord the greatest possible deference to the legislature's will. This court has applied a highly deferential standard in cases involving evenhanded highway safety regulations that do not create uniformity problems. American Trucking Associations v. Larson, 683 F.2d 787, 795 (3d Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982). This deference amounts to upholding such statutes unless the putative local benefits are "illusory" or alternatively "slight or problematical." Id. Neither the Supreme Court nor this court, however, has applied such a deferential standard to nondiscriminatory environmental statutes. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 472, 101 S.Ct. 715, 728, 66 L.Ed.2d 659 (1981) (applying balancing test).
 
 D. Balancing Test
 
 66
 Given that we have found the heightened scrutiny and deferential standards inapplicable, we hold that a balancing analysis is appropriate in this case. This holding is consistent with Clover Leaf Creamery, in which the Supreme Court held that the balancing test articulated in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), is the appropriate tool for evaluating environmental statutes which impose incidental burdens on interstate commerce:
 
 
 67
 [I]f a statute regulates "evenhandedly" and imposes only "incidental" burdens on interstate commerce, the courts must nevertheless strike it down if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).
 
 
 68
 449 U.S. at 471, 101 S.Ct. at 727-28.
 
 IV. APPLYING THE BALANCING TEST
 
 69
 In order to determine whether the "incidental burdens on interstate commerce" are "clearly excessive in relation to the putative local benefits," one must, of course, identify the putative benefits and the incidental burdens. The putative benefits of the Sec. 7003 ban on offshore solid bulk transfer facilities are the protection of the coastal environment from transfer facility pollutant emissions and the industrial development that might result from the presence of such transfer operations. The district court found a material dispute of fact with respect to the "putative benefits" side of the balance, pointing to disputes over the magnitude and environmental consequence of predicted coal spills and dust emissions. 632 F.Supp. at 1242-43. We conclude that it is unnecessary to review this conclusion because the record reveals no legally relevant burden on interstate commerce that could be found to be "excessive."
 
 
 70
 The "incidental burden on interstate commerce" appropriately considered in Commerce Clause balancing is the degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce. It is a comparative measure. There concededly is language suggesting that any increased costs imposed on out-of-state interests, in an absolute sense, are relevant burdens regardless of whether the same costs are imposed on in-state interests. However, we find that the holdings of the Supreme Court case law, consistent with the anti-protectionism purpose of the Commerce Clause, apply the much narrower comparative burden concept. As earlier noted, virtually all state regulation involves increased costs for those doing business within the state, including out-of-state interests doing business in the state as well as in-state interests. In this absolute sense, virtually all state regulation "burdens" interstate commerce. Where the "burden" on out-of-state interests is no different from that placed on competing in-state interests, however, it is a burden on commerce rather than a burden on interstate commerce. In such cases, nothing in Commerce Clause jurisprudence entitles out-of-state interests to more strict judicial review than that to which the in-state interests are entitled, i.e., arbitrary and capricious review under the Due Process Clause and rational basis review under the Equal Protection Clause, neither of which involves the kind of social value balancing that Norfolk Southern urges us to undertake. To the contrary, the case law makes clear that the Commerce Clause is concerned with protectionism and the need for uniformity and the holdings of the cases demonstrate that legislation will not be invalidated under the Pike test in the absence of discriminatory burdens on interstate commerce. Thus, as this court noted in American Trucking Associations, Inc. v. Larson, 683 F.2d at 791, when the need for uniformity is not at issue, "it is those measures that are discriminatory which are the focus of the Commerce Clause." In the Pike case itself, the "incidental" burden found to be excessive in relation to the "putative benefits" was the requirement that Bruce Church must relocate cantaloupe packing operations from the existing California location into Arizona, a clearly discriminatory measure. Pike v. Bruce Church, Inc., 397 U.S. at 146, 90 S.Ct. at 849. Clover Leaf Creamery is also instructive. In that case, the Court sustained the validity of an evenhanded Minnesota law banning the retail sale of milk in plastic jugs. In considering claims of incidental burden, the Court searched for discriminatory burdens. While the rule would affect dairies selling milk in Minnesota, this was found not to be a relevant burden because there was "no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms." Minnesota v. Clover Leaf Creamery Co., 449 U.S. at 473, 101 S.Ct. at 728. Moreover, the one incidental burden identified by the Court was discriminatory. The Court found that "[p]ulpwood producers are the only Minnesota industry likely to benefit significantly from the Act at the expense of out-of-state firms," the out-of state plastic resin industry. Id.
 
 
 71
 The necessity of a discriminatory burden is dispositive of this case. The burden identified by Norfolk Southern "is the total prevention of a new mode of export that may achieve undeniable commercial significance and that furthers national objectives." Norfolk Southern Br. at 46. This alleged burden, at base, is that the CZA precludes coal exporters from lowering their average transportation costs. This kind of burden is not, however, a legally relevant incidental burden. It is a nondiscriminatory burden that must be shouldered by any coal transporter, regardless of state affiliation. Our observation in American Trucking Associations, Inc. v. Larson is equally pertinent here:
 
 
 72
 If, as is likely, the principal function of the Commerce Clause today is to prevent discrimination against interstate commerce, then once it is conceded that there is no such discrimination, either facially or in application, the inquiry as to the burden on interstate commerce should end.
 
 
 73
 683 F.2d at 799.
 
 
 74
 We find this case virtually on all fours with Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). In that case, the plaintiff owned a fleet of ships which it utilized to transport cement from its mill in Alpena, Michigan, to distributing plants in various states bordering the Great Lakes. Two of its vessels were equipped with hand-fired Scotch marine boilers. While the vessels were docked for loading and unloading, it was periodically necessary to clean the fires, which caused the boiler stacks to emit smoke in excess of the maximum standards allowable under Detroit's Smoke Abatement Code. Structural alterations would have been required in order to comply with the Code. The plaintiff argued that the Code's requirements as applied to its ships constituted an impermissible burden on interstate commerce and sought an injunction against enforcement of the Code "except where the emission of smoke is caused by the improper firing or the improper use of the equipment upon said vessels." 362 U.S. at 441, 80 S.Ct. at 815. In Huron Cement, as in this case, the challenged regulation imposed significant additional costs upon a party desiring to engage in interstate commerce. The Supreme Court nevertheless rejected the Commerce Clause attack on the Code:
 
 
 75
 The claim that the Detroit ordinance ... imposes as to appellant's ships an undue burden on interstate commerce needs no extended discussion. State regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand.
 
 
 76
 362 U.S. at 448, 80 S.Ct. at 815. Finding no burden that discriminates against out-of-state interests or in favor of in-state interests, we conclude that the defendants are entitled to summary judgment.
 
 
 77
 In essence, Norfolk Southern's arguments reduce to an assertion that increasing coal exports is in the national interest and that Delaware, in seeking to protect its own environment, has struck an unwise balance between these competing interests. In our view, the dormant Commerce Clause does not authorize a federal court to engage in the kind of broad-based "national interest balancing" requested by Norfolk Southern. Balancing the societal value of decreasing unemployment in the Eastern coal mines and shrinking the size of the trade deficit against the societal value of protecting the coastal zone is within the province of Congress. In contrast, the Commerce Clause, as applied by the judiciary, acts as a limitation on the authority of the states designed to preclude the establishment of protectionist state barriers that would threaten the operation of the federal union.
 
 V. CONCLUSION
 
 78
 We conclude that Sec. 7003 of the CZA was not immunized from Commerce Clause review by the CZMA. We further hold that Sec. 7003 of the CZA does not violate the dormant Commerce Clause. Thus, we will affirm the order of the district court granting summary judgment for appellees.
 
 
 
 *
 Honorable Richard P. Conaboy, United States District Judge for the Middle District of Pennsylvania, sitting by designation
 
 
 [1]
 Supercolliers have a carrying capacity of 100,000 to over 160,000 deadweight tons. 632 F.Supp. at 1229. These ships typically require channel depths of 55 feet or more when fully loaded. The deepest of the East Coast ports has a channel depth of approximately 45 feet. App. at 348-49
 
 
 [2]
 Appellants are Norfolk Southern Corporation, Norfolk Southern Marine Services, Inc., Lamberts Point Barge Co., Inc., Coastal Barge Corporation, Coal Logistics Corporation, and Coastal Carriers Corporation
 
 
 [3]
 Oil lightering is not subject to the CZA ban because it was an existing use at the time of the CZA's enactment and is thus covered by the grandfather provision. 632 F.Supp. at 1229 n. 5. See 7 Del.Code Ann. Sec. 7003 (Supp.1986)
 
 
 [4]
 Section 7003 states in full:
 Heavy industry uses of any kind not in operation on June 28, 1971, are prohibited in the coastal zone and no permits may be issued therefor. In addition, offshore gas, liquid, or solid bulk product transfer facilities which are not in operation on June 28, 1971, are prohibited in the coastal zone, and no permit may be issued therefor. Provided, that this section shall not apply to public sewage treatment or recycling plants. A basic steel manufacturing plant in operation on June 28, 1971, may continue as a heavy industry use in the coastal zone notwithstanding any temporary discontinuance of operations after said date, provided that said discontinuance does not exceed 1 year.
 
 
 [7]
 Del.Code Ann. Sec. 7003 (Supp.1986)
 
 
 [5]
 The Secretary has delegated responsibility for approving state programs to the Assistant Administrator for Coastal Zone Management of the National Oceanic and Atmospheric Administration (NOAA). 15 C.F.R. Sec. 923.2(b) (1986). For convenience, we shall refer throughout only to the Secretary
 
 
 [6]
 The five intervening defendants are the Delaware Saltwater Sportfishing Association, the Kent County Levy Court, the Natural Resources Defense Council, the National Audubon Society and the Sierra Club
 
 
 [7]
 Alternatively, the CZMA might be viewed as delegating to the Secretary of Commerce the power to consent to state action. But see Intervenor's Br. at 32 (specifically rejecting this formulation, arguing instead that the CZMA constitutes conditional consent). Regardless of whether the CZMA is viewed as conferring conditional consent or delegating the power to consent, the same standards of unambiguous Congressional intent apply
 
 
 [8]
 In the amendments of 1976 and 1980, Pub.L. No. 94-370, 90 Stat. 1013 (1976); Pub.L. No. 96-464, 94 Stat. 2060 (1980), four more grant programs were established within the CZMA. 16 U.S.C. Secs. 1455a, 1456a, 1456b, 1456c (1982) (Sec. 1456c was repealed by Pub.L. No. 99-272, Sec. 6045(1), 100 Stat. 127 (1986)). These programs are not pertinent to the present case
 
 
 [9]
 Several coastal states eligible for CZMA funds have chosen not to apply for them. These states are Georgia, Illinois, Indiana, Minnesota, Ohio, Texas, and Virginia. American Petroleum Institute Amicus Br. at 17
 
 
 [10]
 Compare the language of Sec. 1456(e) to the language used by Congress in the McCarran-Ferguson Act: "Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. Sec. 1011 (1982). The Supreme Court found that the McCarran-Ferguson Act immunized a discriminatory California insurance tax from Commerce Clause review: "If Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." Western & Southern Life Insurance Co. v. State Board of Equalization of California, 451 U.S. 648, 652-53, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514 (1981)
 
 
 [11]
 Intervenors rebut the claim that the CZMA did not increase the authority of the states by pointing to the consistency provisions of Sec. 1456(c), which require federal agencies to comply with the standards contained in approved state plans to the greatest extent possible in managing federal property and granting federal licenses and permits. We need not decide whether this is a transfer of authority, because the consistency provisions are not pertinent to the dispute in this case
 
 
 [12]
 Senator Boggs of Delaware inserted an article concerning Delaware's experience with the CZA into the Congressional Record's account of the Senate debate of the CZMA. Intervenors present this as evidence that Congress specifically considered and approved the sort of law enacted by Delaware. The comments of Senator Boggs are the opinion of only one Senator. See New England Power Co., 455 U.S. at 342, 102 S.Ct. at 1102 ("Reliance on such isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazards and 'a step to be taken cautiously.' " ). More fundamentally, evidence that Congress was informed of the CZA does not plainly establish that Congress intended to authorize any otherwise constitutionally invalid elements in that law. The plain authorization requirement is designed to prevent the courts from engaging in "mere speculation as to what Congress 'probably had in mind.' " Id. at 343, 102 S.Ct. at 1102-03
 
 
 [13]
 The UDAG and CDBG grant programs at issue in White are administered by the Department of Housing and Urban Development. Federal law directs the Secretary of HUD to insist that development grant recipients give jobs related to funded projects to lower income persons residing in the project area to the extent possible. 12 U.S.C. Sec. 1701u (1982)
 
 
 [14]
 Appellees also rely on Wardair Canada, Inc. v. Florida Dep't of Revenue, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986), as evidence that the Court is willing to accept consent by negative implication. In Wardair, the Court found consent for imposition of state sales taxes on fuel sold to airlines engaged in international travel on the basis that international conventions restricted the imposition of some state taxes, but did not preclude states from imposing taxes on the sale of goods. There are no comparable facts in this case
 
 
 [15]
 We need not reach the issue of whether approval of the DCMP, which occurred most recently in 1984, can constitute approval of the ban on vessel-to-vessel coal transfers which was not found to be included within the statutory ban by the Delaware Supreme Court until 1985
 
 
 [16]
 We have omitted any discussion of the special values applicable to Commerce Clause challenges to state taxes. See Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 287, 97 S.Ct. 1076, 1083, 51 L.Ed.2d 326 (1977) (in addition to the interest in preventing discrimination against interstate commerce, tax cases raise concerns about whether the activity is sufficiently connected to the state to justify the tax; whether the tax is fairly related to the benefits provided the taxpayer; and whether the tax is fairly apportioned)
 
 
 [17]
 The CZA does not create inconsistencies in the regulation of supercolliers that might impinge on the Commerce Clause interest in uniform regulation of interstate transportation, and Norfolk Southern does not rely upon this federal interest in mounting its attack on the CZA
 
 
 [18]
 The distinction between the "discriminatory effects" found in Hunt and Bacchus and "incidental burdens," to which a balancing test is applied, is both important and hazy. Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) ("We have ... recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the Pike v. Bruce Church balancing approach."). The distinction is best illuminated by considering Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (North Carolina law forbidding the use of any apple grading system other than the USDA system found to have a discriminatory effect against Washington apples which bore a Washington grade and in favor of the competing North Carolina orchards) and Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (Minnesota law prohibiting the retail sale of milk in plastic jugs which had the effect of favoring the in-state pulpwood industry relative to the out-of-state plastic resin industry found to impose an incidental burden on interstate commerce but not to constitute a discriminatory effect). In both Hunt and Clover Leaf Creamery, the Court found that the statute was evenhanded on its face but that the effect of the statute was to advantage in-state commercial interests relative to out-of-state competition in the same market. However, in Hunt the Court labelled the statute discriminatory, while in Clover Leaf Creamery the Court found that the law imposed only incidental burdens. Given the similarity of effects, we can only conclude that distinction lies in the evidence concerning the intent of the legislature in each case. In Hunt there was both direct evidence of protectionist purpose and a finding that the statutory means did not serve the articulated legislative purpose of protecting consumers. By contrast, Clover Leaf Creamery found that the Minnesota law was not motivated by a legislative intent to discriminate and that the statute did serve the stated environmental purpose. Thus, we conclude that a discriminatory effect, as distinct for incidental burden, evidences purposeful discrimination
 
 
 [19]
 In a variation of this argument, Norfolk Southern alleges that there are industrial facilities in Delaware that have been issued permits entitling them to emit more pollutants than the Norfolk Southern project would emit. In order to be nondiscriminatory, according to Norfolk Southern, Delaware must provide it with the opportunity to secure a permit for coal lightering and thereby avoid the cost of alternative means of coal transport. The role which Norfolk Southern seeks to ascribe to the Commerce Clause far exceeds anything that has heretofore been recognized. The clause is intended to promote parity between in-state and out-of-state interests which compete in a given market; it does not prevent a state from distinguishing between types of emission sources. If any constitutional relief from allegedly unfair classification of pollution sources is available, it is under the Equal Protection Clause, not the Commerce Clause
 
 
 [20]
 It holds instead that a facially discriminatory law may be found to be protectionist, and thus invalid, in spite of a legitimate articulated purpose if facially discriminatory means were employed arbitrarily, that is, out-of-state interests were forced to "bear the brunt" of the state action "for no apparent reason other than that they live and voted in other states."
 
 
 [21]
 In Clover Leaf Creamery, the Court indicated that the declared legislative purpose should be given the same deference for this purpose as is accorded in equal protection analysis. For this reason, the Court accepted the conclusion of the Supreme Court of Minnesota with respect to the purpose of the challenged legislation even though that conclusion was reached through equal protection analysis. 449 U.S. at 471 n. 15, 463 n. 7, 101 S.Ct. at 727 n. 15, 723 n. 7
 
 
 [22]
 Section 7001, entitled "Purpose," states in full:
 It is hereby determined that the coastal areas of Delaware are the most critical areas for the future of the State in terms of the quality of life in the State. It is, therefore, the declared public policy of the State to control the location, extent and type of industrial development in Delaware's coastal areas. In so doing, the State can better protect the natural environment of its bay and coastal areas and safeguard their use primarily for recreation and tourism. Specifically, this chapter seeks to prohibit entirely the construction of new heavy industry in its coastal areas, which industry is determined to be incompatible with the protection of that natural environment in those areas. While it is the declared public policy of the State to encourage the introduction of new industry into Delaware, the protection of the environment, natural beauty and recreation potential of the State is also of great concern. In order to strike the correct balance between these 2 policies, careful planning based on a thorough understanding of Delaware's potential and her needs is required. Therefore, control of industrial development other than that of heavy industry in the coastal zone of Delaware through a permit system at the state level is called for. It is further determined that offshore bulk product transfer facilities represent a significant danger of pollution to the coastal zone and generate pressure for the construction of industrial plants in the coastal zone, which construction is declared to be against public policy. For these reasons, prohibition against bulk product transfer facilities in the coastal zone is deemed imperative.
 
 
 [7]
 Del.Code Ann. Sec. 7001 (1983)
 
 
 [23]
 Norfolk Southern argues that in-state interests are those that contribute to the state's economic health, that is, currently have operations in Delaware. Using this definition and concluding that the statutory exceptions benefit in-state interests is circular, because all businesses with Delaware facilities operating under one of the exceptions to the law are characterized as in-state, while the barred businesses are defined to be out-of-state. Instead, we find that the grandfather clause discriminates between preexisting in-state interests and potential new in-state interests
 
 
 [24]
 Norfolk Southern also points to language in the Preliminary Task Force report which preceded the enactment of the CZA as evidence of discriminatory legislative purpose. The report states:
 The Task Force recommends against approval at the present time of any deep water port facility or offshore island in the lower Delaware Bay because: any expected economic benefits to Delaware of the proposed location in the Bay appear to be more than offset by the considerable additional risk to the environment ... [and] such a facility would contribute a major risk of additional pollution in the Bay and along the shoreline with accompanying deleterious effect on estuarine life.
 App. at 513 (emphasis added).
 The Task Force was a panel appointed by the Governor, not a body of the legislature. Moreover, this passage merely reflects that the concern driving the passage of the CZA was the need for environmental protection, not bolstering the competitive positions of Delaware businesses through indirect trade protectionism. See Clover Leaf Creamery, 449 U.S. at 463 n. 7, 101 S.Ct. at 723 n. 7.