**OLD BRIDGE CHEMICALS, INC., Appellant,**

v.

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION.**

No. 91–5789.

United States Court of Appeals, Third Circuit.

Argued April 10, 1992.

Decided June 10, 1992.

Rehearing Denied July 8, 1992.

Catriona Glazebrook (argued), Richard L. Caplan, Caplan & Luber, Paoli, Pa., for appellant.

Edward J. Dauber, Acting Atty. Gen. of New Jersey, R. Brian McLaughlin, Deputy Atty. Gen. (argued), Mary C. Jacobson, Deputy Atty. Gen., Trenton, N.J., for appellee.

Before: GREENBERG, SCIRICA, and ROSENN, Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents questions arising from a state's regulatory scheme for the disposition and management of toxic wastes within its jurisdiction and a potential conflict with the commerce clause of the federal Constitution and congressional legislation. The New Jersey Department of Environmental Protection (NJDEP), the agency charged with the promulgation and enforcement of regulations governing waste management in the State of New Jersey, enacted a regulatory program governing the management of hazardous wastes. Old Bridge Chemicals, Inc. (OBC) claims that the regulations relating to recyclable by-product hazardous wastes violate the commerce clause and the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 *et seq.* OBC sought relief in the United States District Court for the District of New Jersey to enjoin NJDEP from using RCRA hazardous waste codes to identify this class of hazardous wastes. OBC also sought a declaration that New Jersey's definition of solid waste, without state-specific waste codes, violates the commerce clause. The district court entered summary judgment for the New Jersey Department of Environmental Protection. OBC appealed and we affirm.

I.

OBC is a chemical manufacturing company chartered under New Jersey laws with

gross annual sales approaching $20 million. For twenty years, it has purchased chemicals, including zinc oxide, sulfuric acid, copper sulfate solution and crystals, copper chloride, and copper ammonium chloride, from out-of-state companies. These out-of-state companies produce the chemicals as necessary adjuncts to the manufacture of primary marketable commodities. OBC uses them in the production of pure, basic chemicals for sale to agriculture, water treatment, dry cell battery, and textile industries.

Under the New Jersey Solid Waste Management Act, NJDEP has the responsibility to promulgate and update rules and regulations concerning the State's waste management. N.J.Stat.Ann. § 13:1E-6. In 1987, NJDEP adopted a revised definition of "solid waste," which made its definition of solid waste more expansive and stringent than the federal definition.[1] Although the federal definition excludes any materials recycled "as effective substitutes for commercial products," 40 C.F.R. § 261.-2(e)(1)(ii), New Jersey's amended definition includes "by-product" materials that are recycled.[2] N.J.A.C. 7:26–1.6(b)5. As a consequence of the new regulations, many of the raw materials used by OBC are now classified as solid wastes under the New Jersey definition notwithstanding their exemption from federal regulation. In addition, under both the federal and state regulations, a substance considered a "hazardous waste" must first classify as a solid waste. See 40 C.F.R. § 261.3; N.J.A.C. 7:26–1.4. Because NJDEP's definition of "solid waste" includes by-product materials that are recycled, such materials may be hazardous only under the New Jersey scheme.

On January 11, 1990, NJDEP notified OBC that virtually all of OBC's imported raw materials were by-product solid wastes subject to New Jersey's hazardous waste regulations. Under NJDEP's expanded regulations, OBC's imported raw chemicals, copper chloride, and copper ammonium chloride, further classify as by-product solid wastes exhibiting hazardous waste characteristics and are thus hazardous wastes. See N.J.A.C. 7:26–8.1(v). OBC concedes that these raw materials are of a hazardous nature.

Under the New Jersey scheme, these recyclable hazardous wastes must be labelled and identified for record keeping and recording purposes by their characteristic EPA hazardous waste code, even if they originate from out-of-state sources. See id. 7:26–8.5(e), 8.8(e). In addition, although RCRA does not require shipments of such recyclable hazardous wastes to be done "under manifest," New Jersey requires that shipments of these wastes to and from the state be made pursuant to the State's manifest system, modelled after RCRA's. A manifest is a document used to identify the quantity, composition, and the origin, routing, and destination of hazardous wastes during their transportation. 42 U.S.C. § 6903(12). It provides a "cradle to grave" means for tracking hazardous wastes through a paper trail from the point of generation to the point of treatment, storage, or disposal. Id.

For wastes originating in or destined for points in New Jersey, a generator[3] of hazardous waste must complete a RCRA Uniform Hazardous Waste Manifest, RCRA's manifest for hazardous wastes adopted by NJDEP regulations. N.J.A.C. 7:26–7.4(a)(3); 40 C.F.R. § 262 app. The Uniform Manifest requires, inter alia, information regarding the particular nature of the hazardous wastes and the generator and transporter of the wastes. The Uniform Manifest also requires the generator's EPA

1. The rule amendments at issue in this litigation were adopted effective December 21, 1987, and along with all other NJDEP waste management regulations, were readopted effective October 25, 1990 with an expiration on that date in 1995.

2. N.J.A.C. 7:26–1.4 defines a "by-product" as a material that is not one of the primary products of a production process and is not solely or separately produced by the production process.

3. A "generator" is a person, by site, whose act or process produces solid waste or whose act first causes solid waste to become subject to regulation. N.J.A.C. 7:26–1.4.

identification number, a number unique to each generator of hazardous waste.

To obtain an EPA identification number, the generator must file a Form 8700–12 entitled "Notification of Regulated Waste Activity" with the EPA. This form, which is designed in part to help companies determine whether and how they must comply with RCRA notification requirements, specifically designates a space labelled "other wastes" that is reserved for listing "state or other wastes requiring an I.D. number." The instructions for completing this form advise generators that "[m]any States have requirements that vary from the Federal regulations. These State regulations may be more strict than the federal requirements by identifying additional wastes as hazardous." Companies are informed that they are required to learn about and comply with all state regulations that apply to them and are "strongly urged" to contact the appropriate state hazardous waste contact agencies, alphabetically listed with addresses and phone numbers in the instructions accompanying the form.

Before allowing the hazardous waste to leave its property, the generator must forward one copy of the Uniform Manifest to the state of origin and one copy to the state of destination. N.J.A.C. 7:26–7.4(a)(5)(iii). Additional notification requirements apply for shipments by railroad or water. *Id.* 7:26–7.4(a)(7), (8). Although the shipment of hazardous wastes by manifest is a federal requirement, RCRA expressly allows a state to require a copy of each manifest used in connection with hazardous waste generated within that state or transported to a treatment, storage, or disposal facility within the state. 42 U.S.C. § 6929 (West Supp.1992).

OBC does not object to New Jersey's more expansive definition of "solid waste," but argues that New Jersey's use of the RCRA hazardous waste codes creates a detrimental impact upon interstate commerce because it appears that such coding *ipso facto* renders New Jersey-only hazardous wastes subject to nationally restrictive RCRA hazardous waste regulations in interstate shipment. OBC asserts that as a

consequence, its out-of-state suppliers are refusing to continue to sell such recyclable by-product materials to OBC or are threatening to withdraw as suppliers because they do not wish to be burdened by New Jersey's requirements for manifesting, labelling, and transporting non-federally designated hazardous wastes. They fear that identifying their routinely marketed products as federal hazardous wastes could subject them to federal regulatory liability as unlicensed hazardous waste generators or transporters. OBC claims that these potential losses to its sources of supply may force it to close its operations.

## II.

In deciding this case, we recognize the serious difficulties inherent in hazardous waste management, particularly in the State of New Jersey. As we have previously noted, the disposition of solid waste in New Jersey "has been in a state of crisis since the midseventies, and continues to be 'one of [the] state's most severe problems.'" *J. Filiberto Sanitation, Inc. v. New Jersey Dep't of Envtl. Protection,* 857 F.2d 913, 918 (3d Cir.1988) (quoting *A.A. Mastrangelo, Inc. v. Commissioner of Dep't of Envtl. Protection,* 90 N.J. 666, 670–71, 449 A.2d 516, 518–19 (1982)). However, solid waste is an increasingly common commodity of interstate commerce, *City of Philadelphia v. New Jersey,* 437 U.S. 617, 621–23, 98 S.Ct. 2531, 2534–35, 57 L.Ed.2d 475 (1978); therefore, New Jersey's regulations must be consistent with the dictates of the commerce clause. In addition, although the state is understandably driven to correct the public health and safety problems posed by hazardous wastes, New Jersey, in its efforts to do so, must not contravene RCRA.

In interpreting the applicable federal legislation and regulations to determine Congress's intent, and in interpreting New Jersey's regulations to determine whether they comport with the Constitution and the federal environmental scheme, our role is not to pass judgment on the effectiveness and wisdom of the particular state regulations at issue, but only to apply the law as

we find it. We conduct a plenary review of the district court's decision to ascertain whether the record reveals any disputed issues of material fact and whether NJDEP, as the moving party, is entitled to summary judgment as a matter of law. *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 568 (3d Cir.1986).

### A. Commerce Clause Claim

The commerce clause specifically grants Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. Although the clause does not expressly limit state interference with interstate commerce, the Supreme Court nonetheless has historically held that the clause prohibits states from taking certain actions regarding interstate commerce even absent congressional action. *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987). The Constitution itself does not articulate the boundaries of the commerce power vested in Congress, particularly when Congress remains silent, and it has been left to the Court to interpret the self-executing limitations that the clause sets on the scope of permissible state regulation. The clause, as applied by the judiciary, "acts as a limitation on the authority of the states designed to preclude the establishment of protectionist state barriers that would threaten the operation of the federal union." *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 407 (3d Cir.1987).

■■■ In analyzing the scope of the dormant commerce clause, this court has articulated three standards of review:

(1) state actions that purposefully or arbitrarily discriminate against interstate commerce or undermine uniformity in areas of particular federal importance are given heightened scrutiny;

(2) legislation in areas of peculiarly strong state interest is subject to very deferential review; and

(3) the remaining cases are governed by a balancing rule, under which state law is invalid only if the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits. *Juzwin v. Asbestos Corp.*, 900 F.2d 686, 689 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 204 (1990); *Oberly*, 822 F.2d at 398–99.

OBC argues that NJDEP's regulations are subject to a strict scrutiny review, while NJDEP argues that a balancing test is appropriate.[4] In deciding which test applies, we bear in mind that the Supreme Court has recognized that no clear line distinguishes those regulations subject to heightened scrutiny, which will almost always be invalidated, and the category reviewable under a balancing test. *J. Filiberto*, 857 F.2d at 919..

### 1. Heightened Scrutiny

■■ OBC argues, citing to *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), that the New Jersey regulations are subject to heightened scrutiny, with the burden falling upon the State to demonstrate both that the regulations serve a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means. As the party attacking the regulation, OBC had the burden on NJDEP's motion for summary judgment of showing the existence of discrimination. *J. Filiberto*, 857 F.2d at 919.

Heightened scrutiny is appropriate here, according to OBC, because NJDEP regulations undermine uniformity in an area of particular federal importance. OBC argues that hazardous wastes implicate such broad and complex national concerns that supervision by a federal agency (the EPA) and federal laws specifically dealing with the management of hazardous wastes and the remediation of existing contamination (RCRA and "CERCLA") are necessary. It contends that NJDEP's borrowing of

---

**4.** Neither party argues that we should review NJDEP's regulations under the third type of dormant commerce clause review, the "deferential review." In addition, we have recognized

that neither this court nor the Supreme Court has ever applied such a deferential standard to nondiscriminatory environmental statutes. *Oberly*, 822 F.2d at 405.

RCRA codes undermines the uniformity of this federal hazardous waste scheme because labeling state-only wastes with RCRA codes gives the appearance that these wastes are hazardous under RCRA, thereby causing individuals to second guess the otherwise uniform Act. In addition, we are reminded that if we uphold New Jersey's scheme, other states will be encouraged to adopt their own unique system for identifying hazardous wastes, thus further disrupting the uniformity of the federal waste codes.

■ The commerce clause prohibits states from regulating subjects that "are in their nature national, or admit only of one uniform system, or plan of regulation." *CTS Corp. v. Dynamics*, 481 U.S. at 88–89, 107 S.Ct. at 1649 (quoting *Cooley v. Board of Wardens*, 12 How. 299, 319, 53 U.S. 299, 13 L.Ed. 996 (1852)). Therefore, as stated, we apply the heightened scrutiny test as a standard of review when a regulation undermines uniformity in an area of particular federal importance. *Juzwin*, 900 F.2d at 689; *Oberly*, 822 F.2d at 398–99.

■ It is undisputed that hazardous waste management is an area of national importance. Congress passed RCRA in 1976 as the principal federal statute regulating the generation, transportation, and disposal of hazardous wastes, stating that the problems of waste disposal had "become a matter national in scope and in concern and necessitat[ed] federal action." 42 U.S.C. § 6901(a)(4). However, although waste management may be an area of overriding national importance, in legislating in this field Congress has set only a floor, and not a ceiling, beyond which states may go in regulating the treatment, storage, and disposal of solid and hazardous wastes.

RCRA expressly allows states to adopt more stringent "requirements" than those imposed by the EPA regulations, although states may not impose any regulations less stringent than the floor set by RCRA. The "savings clause" of RCRA states:

> [N]o State ... may impose any requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulations.... Nothing in this chapter shall be construed to prohibit any State ... thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations.

*Id.* § 6929. This express provision of RCRA reveals a congressional intent that hazardous waste is not an area of *particular* federal importance requiring one uniform national system or plan of regulation. In fact, although Congress recognized the need for federal regulation, it stated that "the collection and disposal of solid wastes should continue to be primarily the function of the State." *Id.* § 6901(a)(4).

The structure of EPA's Form 8700–12 is further evidence that RCRA envisions a dual federal-state system of hazardous waste regulation, with states able to categorize additional wastes as hazardous. This form specifically designates a space reserved for listing state regulated wastes, and it advises originators of hazardous waste that "[m]any States have requirements that vary from the Federal regulations [which] *may be more strict than the federal requirements by identifying additional wastes as hazardous.*" (Emphasis added). The form reveals that the EPA contemplates that RCRA enables states to designate wastes as hazardous beyond those RCRA designates as hazardous.

Moreover, there is no congressional intent to preempt the entire field of interstate waste management or transportation. *City of Philadelphia*, 437 U.S. at 620 and n. 4, 98 S.Ct. at 2533 and n. 4. This provides further evidence that Congress did not intend RCRA to assume overriding federal importance at the expense of the states' sovereign power to enact more stringent, but not conflicting, state regulation. Thus, the heightened scrutiny applied to state statutes undermining uniformity in areas of particular federal importance is not implicated because the federal statutory and regulatory framework affords states the option to adopt their own, more stringent, hazardous waste regulations so long as they do not discriminate against

out-of-state interests or favor in-state interests.

We point out that the state regulatory scheme in this case does not result in the "misidentification" of the chemicals under manifest, as OBC claims. Any New Jersey waste that is required to be labelled with RCRA codes contains the same chemical composition and inherent dangers as the RCRA waste labelled with the corresponding code. The only difference is that RCRA exempts chemicals destined for recycling, but New Jersey does not. New Jersey simply requires that by-product materials be marked with the same code that they would receive under RCRA if they were not recyclable. In this manner, use of the EPA waste codes already familiar to the regulated community actually fosters the uniformity of codes because it immediately communicates the precise chemical nature of the hazardous waste under manifest.

OBC also argues that we should apply heightened scrutiny because NJDEP's regulations subject recyclable by-product materials like copper chloride and copper aluminum chloride to conflicting commands from different states. The Supreme Court has invalidated state statutes where a state has "projected" its legislation into other states and directly regulated commerce therein, thereby either forcing individuals to abandon commerce in other states or forcing other states to alter their regulations to conform with the conflicting legislation. *See, e.g., Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 583–84, 106 S.Ct. 2080, 2086–87, 90 L.Ed.2d 552 (1986); *Edgar v. MITE Corp.*, 457 U.S. 624, 642, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (1982). The Court has acted similarly where a state statute created contradictory and inconsistent state regulation of vehicles which burdened interstate transportation. *See, e.g., Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 671, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981).

For several reasons, the regulations at issue here do not pose such problems. First, OBC has not pointed to regulations of other states which *conflict* with the New Jersey solid waste regulations. OBC merely asserts that unlike New Jersey, other states do not define the above mentioned by-product materials as solid wastes. "Although the Supreme Court has at times invalidated a state regulation because of the *possibility* that it might conflict with another state's regulation, in more recent cases the Court has required a demonstration of *actual conflict.*" Lawrence H. Tribe, *American Constitutional Law* 435 (2d ed. 1988). As there is no actual conflict among state regulations, NJDEP's regulations do not burden interstate commerce with *"inconsistent* regulations." In addition, New Jersey is not "projecting" its legislation into other states. Nor does OBC claim that NJDEP's regulations require out-of-state companies to abandon commerce in other states or require other states to alter their waste management schemes to conform with New Jersey's.

Thus, we conclude, as did the district court, that the appropriate test for evaluating NJDEP's regulations is not heightened scrutiny, but rather the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). This choice is consistent with *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1980) and *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

In *Clover Leaf Creamery*, the Supreme Court reviewed a state environmental statute banning the sale of milk in plastic non-returnable, non-refillable containers. The Court stated: "If a state law purporting to promote environmental purposes is in reality 'simple protectionism,' we have applied a 'virtually *per se* rule of invalidity.'" 449 U.S. at 471, 101 S.Ct. at 727 (quoting *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535). The Court then held that the state law did not effect "simple protectionism," but "regulate[d] evenhandedly" because it prohibited *all* milk retailers from selling milk in the plastic bottles, regardless of whether the milk, the containers, or the sellers emanated from outside the state. *Id.* at 471–72, 101 S.Ct. at 727–28. Therefore, the Court concluded, the statute

differed from other statutes discriminating against interstate commerce which it had consistently struck down. *Id.* Because the statute did not discriminate between interstate and intrastate commerce, the Court applied the *Pike* balancing test. *Id.*

On the other hand, in *City of Philadelphia*, the Court struck down as protectionist a New Jersey environmental statute that banned the importation into the state's landfills of most solid or liquid waste originating outside of the state. The Court stated that the statute would not have violated the commerce clause, even if the statute incidentally had affected interstate commerce, had New Jersey chosen to "slow[ ] the flow of *all* waste into the State's remaining landfills." 437 U.S. at 626, 98 S.Ct. at 2536. *See also CTS Corp. v. Dynamics*, 481 U.S. at 88, 107 S.Ct. at 1649 (rejecting claim of discrimination where state statute imposed same burden on in-state and out-of-state security tender offerors); *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 619, 101 S.Ct. 2946, 2954, 69 L.Ed.2d 884 (1981) (rejecting a claim of discrimination because the "tax burden [was] borne according to the amount ... consumed and not according to any distinction between in-state and out-of-state consumers").

As in *Clover Leaf Creamery*, here OBC does not sufficiently claim that NJDEP's regulations are grounded in protectionism.[5] The regulations are not an example of the "simple protectionist" legislation meriting

a strict scrutiny analysis. Rather, the regulations apply evenhandedly to in-state and out-of-state companies and therefore merit a balancing test analysis. *Accord Old Coach Dev. v. Tanzman*, 881 F.2d 1227, at 1231 (3d Cir.1989) (*Pike* test applicable where statute is facially neutral and does not have a discriminatory purpose); *J. Filiberto*, 857 F.2d at 919 (*Pike* test applies if state environmental statute "seeks to achieve [a legitimate] goal by means that do not transfer the burden of the solution onto out-of-state interests"); *Oberly*, 822 F.2d at 405 (*Pike* balancing test "is the appropriate tool for evaluating environmental statutes which impose incidental burdens on interstate commerce"); *cf. Nat'l Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management*, 910 F.2d 713, 720 (11th Cir.1990) (heightened scrutiny applied to protectionist state environmental statute).[6]

### 2. The Balancing Test

■ The *Pike* balancing test, applicable to nondiscriminatory state environmental statutes, requires:

> [I]f a statute regulates "evenhandedly" and imposes only "incidental" burdens on interstate commerce, the courts must nevertheless strike it down if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Moreover, "the ex-

---

**5.** A state law may constitute "economic protectionism" on proof of either discriminatory purpose or discriminatory effect. *Clover Leaf Creamery*, 449 U.S. at 471 n. 15, 101 S.Ct. at 727 n. 15. OBC does not contend that the New Jersey regulations have a discriminatory purpose, but argues that the effect of the regulations is discrimination against out-of-state companies. However, this court has interpreted the Supreme Court's "discriminatory effect" cases to be cases of purposeful discrimination. *See Oberly*, 822 F.2d at 400. Because OBC claims no purposeful discrimination on the part of New Jersey, the strict scrutiny test is inapplicable under the "discriminatory effect" rationale.

**6.** OBC argues that NJDEP's regulations may be discriminatory, implicating a strict scrutiny analysis, even though they affect in-state as well as out-of-state interests. For this proposition,

OBC relies on *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), in which the Supreme Court invalidated a state statute that required all trucks originating from in-state or travelling interstate to install curved mudguards.

We reject OBC's reasoning because it runs counter to *Clover Leaf Creamery*, *CTS Corp. v. Dynamics*, and *Commonwealth Edison Co. v. Montana*, where the Court rejected claims that state statutes were discriminatory because the statutes applied "even-handedly" without regard to whether the commerce came from out-of-state. As we have observed, the Supreme Court "has found facially evenhanded legislation to have a discriminatory effect only where the state law advantages in-state businesses in relation to out-of-state businesses." *Oberly*, 822 F.2d at 402; *J. Filiberto*, 857 F.2d at 921.

tent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Ibid.*

*Clover Leaf Creamery,* 449 U.S. at 471, 101 S.Ct. at 727.

Under this court's precedent, the only incidental burdens on interstate commerce that implicate the commerce clause under this balancing test are those that discriminate against interstate commerce. *See J. Filiberto,* 857 F.2d at 922; *Oberly,* 822 F.2d at 406. We have so held because the commerce clause is concerned with protectionism and the need for uniformity, and case law demonstrates that legislation will not be invalidated under the *Pike* test unless it imposes *discriminatory* burdens on interstate commerce. *Oberly,* 822 F.2d at 406; *see also City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535 ("incidental burdens on interstate commerce may be unavoidable when a state legislates to safeguard the health and safety of its people").

Thus, where the burden on out-of-state interests rises no higher than that placed on competing in-state interests, it is a burden on *commerce* rather than a burden on *interstate* commerce. *Oberly,* 822 F.2d at 406. Because "nothing in Commerce Clause jurisprudence entitles out-of-state interests to more strict judicial review than that to which the in-state interests are entitled," we must determine the degree to which NJDEP regulations incidentally discriminate against interstate commerce relative to intrastate commerce. *Id.*

█ A challenged regulation is discriminatory when it confers advantages upon instate economic interests, either directly or through imposition of a burden upon out-

of-state interests, as against out-of-state competitors. *J. Filiberto,* 857 F.2d at 919. The district court reasoned that the challenged regulations burdened all commerce, not just interstate commerce, inasmuch as both New Jersey producers and OBC's out-of-state producers of the solid waste hazardous materials were required to abide by the manifest requirements. The court concluded that because the need for uniformity was not at issue and the challenged regulations applied even-handedly to all, the regulations imposed no burden on interstate commerce. In addition, because NJDEP's regulations did not impose an incidental burden on interstate commerce, any further discussion of the "putative benefits" of the regulations was unnecessary.

We agree with the district court's analysis. OBC does not demonstrate that the regulations impose any greater burden on interstate commerce than they do on intrastate commerce. Generators of hazardous waste, both in-state and out-of-state, are required to identify the recyclable by-product materials using the appropriate RCRA codes and to transport these materials under manifest. Any New Jersey company seeking to supply OBC with the same hazardous by-product materials must comply with the same labelling and manifest regulations as out-of-state shippers.[7] The district court correctly concluded, therefore, that NJDEP regulations create no incidental burden on *interstate* commerce, but instead burden all commerce. Because there is no burden on interstate commerce, an analysis of the "putative benefits" of NJDEP regulations is unnecessary. *See id.* at 922.[8]

Our result in this case is consonant with our decision in *Norfolk Southern Corp. v.*

---

7. The NJDEP explains that it regulates the recyclable by-product wastes exempt from RCRA because it believes that the nature of the material, not its intended use, should govern the way the material should be handled. New Jersey believes that materials of a hazardous nature should be handled as hazardous wastes so as to best protect the state's public health and safety during the transportation, storage, and treatment of those materials, whether they are ulti-

mately disposed of or recycled, and whether the source of the material is in-state or out-of-state.

8. It follows that because OBC cannot demonstrate a burden on interstate commerce, we need not consider the *Pike* analysis involving alternative, less burdensome measures available to the state, and therefore decline to consider the relative value of alternatives to New Jersey's present scheme as OBC urges.

*Oberly,* 822 F.2d 388. In *Oberly,* we reviewed a Delaware coastal zone statute banning product transfer facilities in Delaware's coastal zone. Plaintiffs, who sought to initiate a coal lightering service in Delaware Bay, alleged that the statute burdened interstate commerce by precluding coal exporters from lowering their average transportation costs. In conducting the *Pike* balancing test, we observed that this kind of burden was not a legally relevant incidental burden, because it was shouldered by any coal transporter, regardless of state affiliation. Finding no burden that discriminated against out-of-state interests or in favor of in-state interests, we concluded that the statute did not violate the commerce clause. *Id.* at 407. *See also Clover Leaf Creamery,* 449 U.S. at 473, 101 S.Ct. at 728 (no incidental burden where "no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms"); *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960) ("State regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand.").

In sum, we conclude that NJDEP regulations do not burden interstate commerce. OBC argues that NJDEP could rectify the whole problem by creating unique codes for the recyclable by-product hazardous wastes as it has done for waste oils, thereby enabling New Jersey to monitor the transportation of such materials within the State without implying to other states that the materials are RCRA hazardous wastes. It seems to us that the use of the EPA codes accompanied by a manifest listing the waste as a New Jersey-only hazardous waste has the same effect as using state-specific codes. Nevertheless, whether OBC's particular solution to New Jersey's environmental concerns is wise or practical is not for us to decide, but for the New Jersey state legislature to consider. As the district court aptly observed (quoting *Exxon Corp. v. Maryland,* 437 U.S. 117, 127–28, 98 S.Ct. 2207, 2214–15, 57 L.Ed.2d 91 (1978)), this argument "relates to the wisdom of the statute, not to its burden on interstate commerce."

## B. RCRA Claim

■ OBC next argues that NJDEP's regulation classifying the recyclable by-product materials as solid waste is facially inconsistent with RCRA and therefore disrupts the uniform federal regulatory scheme pertaining to hazardous wastes management. We disagree. RCRA's "savings clause" expressly provides that a state is not precluded from adopting more stringent requirements than those imposed by the EPA regulations. 42 U.S.C. § 6929. In explaining this clause, Congress stated that the regulations promulgated by the EPA were to be "the minimum standards applicable to hazardous waste management." 1976 U.S.C.C.A.N. 6238, 6269. Thus, RCRA sets a floor, not a ceiling, for state regulation of hazardous wastes. Accordingly, NJDEP regulations are consistent with the clear language and intent of RCRA.

In addition, state regulations that differ from federal regulations do not necessarily violate the federal act because RCRA expressly permits more stringent state regulations. Therefore, a mere inconsistency between the state and federal schemes does not constitute a violation of RCRA. *Accord General Electric Co. v. Flacke,* 461 N.Y.S.2d 138, 118 Misc.2d 729 (1982) (state environmental regulation's definition of "waste" which included reused or recycled materials was not inconsistent with RCRA because RCRA "allows states to require stricter and more stringent standards than the federal program.")

Moreover, OBC's assertion that the regulations pose a threat to the uniformity of the RCRA identification system is suspect in light of the availability of two spaces on the manifest form for identifying the transported wastes as "New Jersey special wastes not subject to federal RCRA requirements," thereby simply removing any doubt that the materials are RCRA wastes and any consequent threat to the uniformity of RCRA. Further, as we observed earlier, use of the RCRA codes actually

enhances the uniformity of the federal codes because the New Jersey-only wastes contain the same chemical composition and inherent dangers as the corresponding RCRA wastes. Finally, out-of-state manufacturers solely shipping recyclable by-product materials to New Jersey need not fear federal liability for shipping non-federally designated wastes because they may inform the EPA on their Form 8700–12 that they will be shipping New Jersey-only hazardous wastes.

### III.

In summary, NJDEP's hazardous waste regulations defining recyclable by-products as solid wastes and requiring such wastes, if hazardous, to be marked with EPA codes, do not violate the commerce clause. OBC fails to make the showing of discrimination or threat to uniformity in an area of particular federal importance necessary to implicate heightened scrutiny. Under the *Pike* balancing test, the New Jersey scheme is constitutional as it does not burden interstate commerce. Further, there has been no showing of a violation of RCRA stemming from New Jersey's use of the federal waste codes. Accordingly, the district court's summary judgment will be affirmed.