**TENNESSEE RIVERKEEPER, INC., Plaintiff,**

v.

**3M COMPANY et al., Defendants.**

**Civil Action Number 5:16–cv–01029–AKK**

United States District Court, N.D. Alabama, Northeastern Division.

Signed 02/10/2017

---

Mark E. Martin, Mark E. Martin LLC, Oneonta, AL, William C. Matsikoudis, Derek Scott Fanciullo, Matsikoudis & Fanciullo, LLC, Jersey City, NJ, for Plaintiff.

Harlan Irby Prater, IV, M. Christian King, William H. Brooks, William S. Cox, III, Lightfoot Franklin & White LLC, Joshua S. Thompson, John W. Scott, Scott Dukes & Geisler PC, Birmingham, AL, Michael Joseph Collins, Stephanie Leeann Gase, William Andrew Brewer, III, Brewer, Attorneys & Counselors, Dallas, TX, Michael Lee Smith, Brewer, Attorneys & Counselors, New York, NY, Andrew L. Schulkin, Lathrop & Gage LLP, Chicago, IL, William G. Beck, Lathrop & Gage LLP, Kansas City, MO, David W. Langston, William E. Shinn, Jr., Barnes F. Lovelace, Jr., Harris Caddell & Shanks PC, Decatur, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ABDUL K. KALLON, UNITED STATES DISTRICT JUDGE

Tennessee Riverkeeper, Inc. (the "Riverkeeper") filed this action seeking declaratory and injunctive relief under Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act of 1976, 42 U.S.C.

§ 6972(a)(1)(B) (the "RCRA"). Doc. 1. The court has for consideration motions to dismiss filed by BFI Waste Systems of Alabama, L.L.C., doc. 28; 3M Company, doc. 36; and the City of Decatur, Alabama, doc. 39. The motions are fully briefed, docs. 33; 37; 40; 42; 43; 45; 46; 47; 51, and ripe for review. For the reasons stated below, each motion is due to be denied.

## I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citations and internal quotation marks omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citations

omitted) (internal quotation marks omitted). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

## II. FACTUAL BACKGROUND [1]

This action arises out of defendants' alleged discharge of hazardous and solid waste containing perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid ("PFOS"), and related chemicals near Decatur, Alabama, resulting in "the contamination of groundwater, sediments, private water supplies, the Tennessee River and its tributaries, fish, and public drinking water supplies that utilize water from the Tennessee River." Doc. 1 at 1. Due to the stable carbon-fluorine bonds in PFOA and PFOS, "[t]here is no known environmental breakdown mechanism for these chemicals," *id.* at 10. Studies, including one by an independent science panel, have shown that human absorption of PFOA and PFOS may cause "cancer, immunotoxicity, thyroid disease, ulcerative colitis and high cholesterol." *Id.* at 10–11.

---

1. For purposes of Fed. R. Civ. P. 12(b)(6), the plaintiff's allegations are presumed true. As such, the facts are taken from the complaint, doc. 1. *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)) ("When considering a motion to dismiss, all facts set forth in the plain-

tiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'"). However, legal conclusions unsupported by factual allegations are not entitled to that assumption of truth. *See Iqbal*, 556 U.S. at 662, 129 S.Ct. 1937.

3M owns and operates manufacturing and disposal facilities in Decatur, Alabama, which have released and continue to release PFOA, PFOS, and related chemicals into surface water and groundwater, through which the chemicals are ultimately discharged into the Tennessee River and its tributaries. *Id.* at 8. 3M has also "disposed of sludge from its on-site wastewater treatment plant." *Id.* Moreover, 3M owns the Bert Jeffries Landfill "which, for many years, accepted industrial waste and sludge contaminated with PFOA, PFOS and related chemicals from 3M's Decatur facility." *Id.* at 9. BFI owns and operates the Morris Farm Landfill, which has also accepted contaminated sludge from 3M's Decatur facility, resulting in "groundwater contamination and the generation of contaminated leachate." Doc. 1 at 9. Finally, the City owns and operates the Morgan County Landfill, which has accepted the "majority" of the industrial waste from 3M's Decatur facility as well as 3M's onsite sludge, resulting in groundwater contamination and the generation of contaminated leachate. *Id.*

In May 2016, the EPA announced Drinking Water Health Advisories for PFOA and PFOS of 0.07 parts per billion ("ppb"). *Id.* at 11. Monitoring at defendants' facilities has revealed levels far in excess of these advisories. For example, Riverkeeper alleges that "[c]oncentrations of PFOA as high as 4,980 ppb and PFOS as high as 3,890 ppb ... more than 70,000 and 55,000 times higher than the EPA's newly-promulgated safety advisory—have been found in groundwater on the 3M site along the south bank of the Tennessee River." Doc. 1 at 13. Tests at the Morris Farm Landfill have shown PFOS concentrations as high as 22.5 ppb. *Id.* at 15. Additionally, tests of groundwater in and around the Bert Jeffries Landfill have shown PFOA and PFOS concentrations as high as 19.4 ppb and 25.1 ppb, respectively. *Id.* at 16. Riverkeeper alleges that de-fendants have long known of the toxicity and persistence of PFOA, PFOS, and related chemicals, but have "knowingly and intentionally disposed of solid and hazardous waste containing these chemicals" and failed to carry out adequate remedial measures. *Id.* at 12.

## III. ANALYSIS

The RCRA established a "cradle-to-grave system" for regulating the disposal of solid and hazardous waste. *United States v. ILCO, Inc.*, 996 F.2d 1126, 1130 (11th Cir. 1993). The RCRA also allows approved states to implement and enforce its provisions, and "a state's EPA–approved program under the RCRA operates 'in lieu of the Federal program.'" *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1006 n.13 (11th Cir. 2004) (quoting 42 U.S.C. § 6926(b)). *See also Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1267 (11th Cir. 2000) (quoting § 6902(a)(7)) ("Congress explicitly sought to establish a 'viable Federal–State partnership to carry out' the purposes of the statute."); *Old Bridge Chemicals, Inc. v. New Jersey Dep't of Envtl. Protection*, 965 F.2d 1287, 1296 (3d Cir. 1992) ("RCRA sets a floor, not a ceiling, for state regulation of hazardous wastes.").

Alabama has such an EPA–approved program pertaining to solid waste landfill permits. *See* 59 Fed. Reg. 9979 (Mar. 2, 1994) ("The EPA has determined that the State of Alabama's statutes and administrative regulations provide for a state-wide comprehensive program of solid waste management including specific provisions for public participation, compliance monitoring and enforcement."); *see also* Ala. Admin. Code rr. 335-13-4-.18, 335-13-4.27. Nonetheless, the Riverkeeper alleges that the State and the EPA have "failed to protect people or the environment from danger," doc. 42 at 5-6 (quoting *Interfaith*

*Community Organization, Inc. v. PPG Indus., Inc.*, 702 F.Supp.2d 295, 314 (D. N.J. 2010)); doc. 1 at 2, and has filed this lawsuit pursuant to the provision that allows private citizens to file suit "against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

The defendants have moved to dismiss based on two primary contentions: first, that the State is already addressing the Riverkeeper's concerns under an EPA–approved program, thus removing the RCRA claims from the purview of this court's subject matter jurisdiction; and second, that the substances at issue do not constitute "solid" or "hazardous" waste under the RCRA. The court will address each defendant's motion separately below.

### A. BFI's Motion

The Riverkeeper alleges that BFI is violating the RCRA "through its ownership and operation of the Morris Farm[ ] Landfill." Doc. 1 at 17.

#### 1. Subject matter jurisdiction

Based on its contention that this lawsuit is a "collateral attack on a valid RCRA permit," BFI asserts that this court lacks subject matter jurisdiction. Doc. 33 at 8. According to BFI, it is shielded from liability here because it received from the Alabama Department of Environmental Management ("ADEM") a Solid Waste Disposal Facility Permit (the "Solid Waste Permit") and a State Indirect Discharge Permit (the "SID Permit"), which "specifically authorize much of the conduct that the Riverkeeper seeks to enjoin in this lawsuit." Doc. 33 at 4–6. *See also id.* at 4–5 (citing doc. 33–1) (stating that the Solid Waste Permit allows the Morris Farm Landfill to "accept all solid waste classified

as non-hazardous, including industrial waste, commercial waste, and dried sludge, and directs the Landfill to collect and dispose of its leachate."); *id.* at 5 (stating that the SID Permit authorizes BFI to discharge "[n]onhazardous municipal solid waste landfill leachate," *see* doc. 33–2 at 5, and does not "limit the concentration of PFCs in the leachate that BFI sends to the Dry Creek WWTP").

 The Riverkeeper does not mention BFI's permits in its complaint, *see* doc. 1, and, generally, a court may not consider materials outside the pleadings in deciding a motion to dismiss. *See Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002). However, "when a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1)," the "district court is free to independently weigh facts, and may proceed as it never could under Rule 12(b)(6)." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003). Because the issue presented by a motion to dismiss under Rule 12(b)(1) is "the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the exercise of its power to hear the case." *Id.* The Eleventh Circuit has cautioned, however, that "federal claims should not be dismissed on motion for lack of subject matter jurisdiction when that determination is intermeshed with the *merits of the claim* and when there is a *dispute as to a material fact.*" *Lawrence v. Dunbar*, 919 F.2d 1525, 1531 (11th Cir. 1990) (emphasis added); *see also id.* at 1530 ("[S]ince we adopt a summary judgment standard in evaluating 12(b)(1) motions that also implicate the merits of a claim, the full panoply of protections afforded the party opposing such a motion will apply here."). A threshold issue, therefore, is whether any potential jurisdictional

issues arising from the permits are "intermeshed" with the merits of the RCRA claim.

■ To prevail on its RCRA claim, the Riverkeeper must prove, among other things, that BFI "has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or *hazardous* waste." *See* 42 U.S.C. § 6972(a)(1)(B) (emphasis added). The crux of this dispute is whether PFOA and PFOS are, in fact, hazardous waste. In that respect, while BFI represents that "[t]he Solid Waste Permit allows BFI to accept waste containing PFC's," doc. 33 at 11, this fact is not dispositive, because the permit only allows the Morris Farm Landfill to receive "nonhazardous" waste. Doc. 33–1 at 3. Therefore, because the parties dispute whether PFOA and PFOS constitute "hazardous" waste under the RCRA, *see* docs. 1 at 1; 33 at 15, the court declines to dismiss the claims against BFI for lack of subject matter jurisdiction without first allowing discovery and an opportunity for the parties to brief this issue at summary judgment. *See Lawrence*, 919 F.2d at 1531.

Likewise, as to BFI's SID Permit, which authorizes BFI to discharge "*nonhazardous* municipal solid waste landfill leachate" from the Landfill at the Dry Creek WWTP, doc. 33–2 at 5 (emphasis added), the court declines to dismiss under Rule 12(b)(1) at this stage since a finding that the SID Permit divests the court of subject matter jurisdiction would necessitate a finding that the leachate is "nonhazardous." [2]

2. Failure to State a Claim

BFI alternatively argues that its leachate discharges do not constitute "solid" or "hazardous" waste and that the Riverkeeper's claims are barred by the RCRA's "anti-duplication" provisions. Doc. 33 at 14. As it relates to the "hazardous" waste contention, the court notes that the "RCRA itself does not include a list of hazardous wastes nor a specific method for determining whether a waste is hazardous." *Edison Elec. Inst. v. United States EPA*, 2 F.3d 438, 441 (D.C. Cir. 1993). Instead, the RCRA defines "hazardous waste," in relevant part, as:

a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness ... or pose a substantial present or potential hazard to human health or the

---

2. Even if the merits were not intermeshed with the jurisdictional inquiry, the cases BFI cites are distinguishable. For example, in *Palumbo v. Waste Tech. Indus.*, 989 F.2d 156 (4th Cir. 1993), the plaintiffs brought suit "challenging the validity of the defendants' state and federal hazardous waste permits, and seeking to enjoin the eventual operation of [an] incinerator." *Id.* at 158. The defendants filed a motion to dismiss for lack of subject matter jurisdiction, which the district court denied, and the Fourth Circuit agreed to hear the jurisdictional issue on an interlocutory appeal. *Id.* at 158–59. The court concluded that the district court lacked jurisdiction to hear the RCRA claims, as the plaintiffs were merely asking for "collateral review [of]

[an] [EPA] decision." *See id.* at 161. Here, the Riverkeeper is not seeking collateral review of an EPA decision or questioning the validity of BFI's permits. *See* doc. 42 at 5 ("Plaintiff is not trying to close Defendant's landfill or have its permit declared invalid."). Next, in the other case, the Sixth Circuit in *Greenpeace, Inc. v. Waste Tech. Indus.*, 9 F.3d 1174 (6th Cir. 1993), determined that the district court lacked subject matter jurisdiction over the RCRA claim when the plaintiff sought to attack explicitly permitted activity. *Id.* at 1181. In this lawsuit, arguing that RCRA requires more stringent regulation than that required by the permits is not tantamount to a request that this court declare the permits "invalid."

environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5). The Riverkeeper alleges that BFI's discharges of PFOA and PFOS meet this definition in part because these substances can cause a variety of illnesses, some of which may be fatal. Doc. 1 at 9–12. Notwithstanding BFI's contention to the contrary and its assertion that these substances do not constitute "hazardous waste" under Alabama law, doc. 33 at 11–12, because BFI has not presented, and this court has not found, any binding authority to support the proposition that a state's definition or list of "hazardous" substances conclusively establishes whether a substance meets that description for RCRA purposes,[3] the court declines to dismiss the Riverkeeper's claims against BFI on that basis at this early stage.

 The court next turns to BFI's contention that the leachate is not a "solid" waste as that term is used under the RCRA. *See* doc. 33 at 15 ("The leachate from Morris Farm is not a *solid*... waste under RCRA because it constitutes an in-dustrial discharge from a point source subject to regulation under the Clean Water Act.") (emphasis added). The RCRA excludes from its definition of solid waste (1) "industrial discharges," (2) that are a "point source," (3) subject to regulation under the Clean Water Act. 42 U.S.C. § 6903(27).[4] To succeed on a Rule 12(b)(6) motion, BFI must conclusively establish all three criteria. BFI cannot do so at this stage because the RCRA does not define "industrial discharge" or "point source," and BFI does not present any binding authority to support its contention that its leachate meets each of the three criteria to trigger the exclusion from the definition of "solid waste" under § 6903(27).

 Finally, the court turns to BFI's contention that the RCRA's anti-duplication provisions "bar the Riverkeeper from seeking relief that is inconsistent with the terms of BFI's SID Permit." Doc. 31 at 21. These anti-duplication provisions require that relief under the RCRA not be "inconsistent with the requirements of [the Clean Water Act]," and that "administration and enforcement [of the RCRA] shall avoid

---

3. At least one court has stated that "leachate from hazardous waste is an important target of RCRA." *O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 642, 656 (E.D. Pa. 1981) (citing 43 Fed. Reg. 58946, 58957–58 (Dec. 18, 1978)). *See also United States v. Mobil Oil Corp.*, No. 96-cv-1432(JG), 1997 WL 1048911, at *9 (E.D.N.Y. Sept. 11, 1997) ("A substance is hazardous if it is 'listed' in regulations published by the EPA or if it exhibits a 'characteristic' of hazardousness, such as toxicity."). The complaint alleges that "EPA determined that ... studies indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)." Doc. 1 at 12. These allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6).

4. The full definition of "solid waste" is

any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but *does not include* solid or dissolved material ... in irrigation return flows or *industrial discharges* which are *point sources subject to permits under section 1342 of title 33* ...

42 U.S.C. § 6903(27) (emphasis added). Because the RCRA defines a "hazardous waste" as a *"solid waste,* or combination of *solid wastes,"* *see* 42 U.S.C. § 6903(5) (emphasis added), BFI contends that if the subject leachate is not a "solid waste," then it also cannot be a "hazardous" waste. Doc. 33 at 16.

duplication, to the maximum extent practicable, with [the Clean Water Act]." *See* 42 U.S.C. § 6905(a) & (b)(1). In interpreting these provisions, the Fourth Circuit[5] has stated that

> [s]ince § 6905(a)... does not define "inconsistent," we give this word its ordinary dictionary meaning: "lacking consistency: incompatible, incongruous, inharmonious ... so related that both or all cannot be true." *Webster's Third Int'l Dictionary* 1144; *see also Black's Law Dictionary* (10th ed.) ("Lacking agreement among parts; not compatible with another fact or claim."); *Oxford English Dictionary* ("at variance, discordant, incompatible, incongruous"). To be "inconsistent" for purposes of § 6905(a), then, the [Clean Water Act] must require something fundamentally at odds with what RCRA would otherwise require. *See Edison Elec. Inst. v. EPA*, 996 F.2d 326, 337 (D.C. Cir. 1993) (rejecting anti-duplication provision argument where petitioners were "unable to point to any direct conflict between" RCRA and another act listed in § 6905(a)). RCRA mandates that are just different, or even greater, than what the [Clean Water Act] requires are not necessarily the equivalent of being "inconsistent" with the [Clean Water Act].

*Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 509–510 (4th Cir. 2015). In vacating a district court's order dismissing a case on anti-duplication provision grounds, the *Goldfarb* court explained:

> We ... vacate and remand the district court's decision, if based on Rule 12(b)(6), for the failure to identify how the Complaint's RCRA allegations are

"inconsistent" with the CWA. But in doing so, we also note that the procedural posture of this case presents a further ground of concern relating back to the proper scope of a court's review of matters outside the pleadings and the taking of judicial notice. *The maze of cross-references to exhibits and interpretations of specific provisions within them makes this case particularly ill-suited to adjudication at the motion to dismiss stage.* As noted, CBAC Gaming raised the anti-duplication provision as a potential defense to liability, and it relied almost exclusively on exhibits outside the Complaint in doing so. That alone inclines against deciding the case under Rule 12(b)(6).

*Id.* at 510–511 (emphasis added). The court finds this reasoning persuasive and, for the reasons noted by the Fourth Circuit, will not dismiss on this basis.

### B. 3M's Motion

The Riverkeeper alleges that 3M is violating the RCRA "through its ownership and operation of the 3M Decatur Facility, its ownership of the Bert Jeffries Landfill, and its generation and disposal of wastes containing PFOA, PFOS, and related chemicals...." Doc. 1 at 17. 3M has moved to dismiss for lack of subject matter jurisdiction, and for failure to sufficiently allege "imminent and substantial endangerment" and that 3M's discharges constitute "solid waste." Doc. 37 at 6. The court examines these arguments below.

#### 1. Subject matter jurisdiction

##### a. Mootness

3M first asserts that the Riverkeeper's claims are moot because they are

---

**5.** This court has not found any specific guidance as to this issue from the Eleventh Circuit. The only case from any court in this Circuit that this court found that even mentions the anti-duplication provisions, albeit without discussing their application in any detail, is *Jones v. E.R. Snell Constr., Inc.*, 333 F.Supp.2d 1344, 1349–50 (N.D. Ga. 2004).

subsumed by a 2008 Remedial Action Agreement ("RAA") between 3M and the ADEM, which is "in effect until 2019" and "judicially enforceable if 3M fails to comply." *Id.* at 8, 11 (citing *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, L.L.C.*, 637 F.Supp.2d 983, 990 (N.D. Ala. 2009), which found that the defendant's consent order with the ADEM "adequately addresse[d] the violations alleged in [the] complaint," and that the claim for injunctive relief was moot because the plaintiff "provide[d] no clear basis to infer that [the defendant] [would] continue to engage in the conduct complained of."). An action becomes moot when the court "cannot grant 'any effectual relief whatever' " in favor of the plaintiff. *Calderon v. Moore*, 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)). However, "even the availability of a 'partial remedy' is 'sufficient to prevent a case from being moot.' " *Calderon*, 518 U.S. at 150, 116 S.Ct. 2066 (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). Therefore, to address the mootness contention, the court must compare the provisions of the RAA to the relief the Riverkeeper seeks. Relevant here, the RAA's stated purpose is to "provide a mechanism . . . for the performance and oversight of remediation activities that will be undertaken by 3M in the former sludge incorporation area . . . on the site." Doc. 37–5 at 2. The RAA further provides that the "activities to be performed" include installation of a "multilayer cap over the [former sludge incorporation area] with groundwater migration controls and treatment" and the "install[ation] [of] a monitoring well network, perform[ance] [of] periodic sampling and analysis, relocat[ion] [of] certain on-site sludges and off-site residual material . . . , and provi[sion] [of] appropriate restoration

of the [former sludge incorporation area]." *Id.* at 4.

According to the Riverkeeper, "live controversies" exist for adjudication because the RAA does not encompass all of the equitable relief the Riverkeeper seeks. Doc. 43 at 12. To support its contention, the Riverkeeper notes that it requests the following equitable relief: (1) a declaratory judgment that 3M has "violated and [is] in violation of [the] RCRA," doc. 1 at 18; (2) "an injunction . . . requiring [3M] to abate and remediate [its] ongoing disposal of PFOA, PFOS and related chemicals that may present an imminent and substantial endangerment to health or the environment," *id.*; (3) "[e]njoin[ing] . . . 3M from disposal of treatment plant sludge or any waste containing PFOA, PFOS or related chemicals at Morris Farms Landfill, Morgan County Landfill, or any other landfill which cannot demonstrate that it has an intact and functioning liner capable of preventing these chemicals from entering groundwater," *id.* at 19; (4) "[e]njoin[ing] . . . 3M from disposal of any waste containing PFOA, PFOS or related chemicals at Decatur Utilities Waste Water Treatment Plant, or any other Waste Water Treatment Plant that does not have adequate methods of removing these chemicals from its waste stream prior to discharge," *id.* at 20; (5) "[r]equir[ing] . . . 3M . . . to remediate groundwater contamination at [its] facilities," *id.*; (6) "[r]equir[ing] . . . 3M to remediate soil contamination at its facility," *id.*; and (7) "[r]equir[ing] . . . 3M to remediate sediment contamination at the Tennessee River," doc. 1 at 20. Based on the court's review of the RAA and the injunctive relief the Riverkeeper seeks, because the RAA's terms do not encompass all of the relief the Riverkeeper seeks, the court agrees with the Riverkeeper that live controversies remain. Therefore, 3M's mootness argument fails.

### b. Abstention

3M next asserts that the court should abstain because the claims at issue involve highly technical or scientific knowledge within the purview of the ADEM. Doc. 37 at 14. "Although abstention is permissible, it is the exception and not the rule." *Colorado River Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). In fact, federal courts have a "virtually unflagging duty to exercise jurisdiction conferred upon them by Congress," and "only in exceptional cases" should a court "abdicate its duty" to "withhold otherwise authorized equitable relief." *See Spillane v. Commonwealth Edison Co.*, 291 F.Supp.2d 728, 731 (N.D. Ill. 2003) (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)). The court declines to abstain due to the apparent lack of ongoing ADEM or EPA proceedings, *see* doc. 1 at 4, and because, as another judge of this court put it in a similar case, "upon the presentation of evidence, this court is quite capable of determining whether a danger exists, and certainly may rely upon the assistance of experts to resolve such issues." *Gamble v. PinnOak Res., L.L.C.*, 511 F.Supp.2d 1111, 1127 (N.D. Ala. 2007) (citing Fed. R. Evid. 702); *see id.* (rejecting abstention on the basis of the primary jurisdiction doctrine when "Defendants have not demonstrated that MSHA proceedings have been initiated or are likely to commence. At this time, the possibility of conflicting orders of this court and MSHA is highly speculative, and uniformity of enforcement would not be undermined by this court's jurisdiction.").

### 2. Failure to state a claim

3M also alternatively contends that its discharges do not constitute "solid waste" under the RCRA, because they are "industrial discharges" that are a "point source" pursuant to an NPDES permit. Doc. 37 at 17–18; *see* 42 U.S.C. § 6903(27). While 3M may ultimately succeed in establishing this fact, this matter is currently before the court on a motion to dismiss. Therefore, where, as here, the Riverkeeper alleges that 3M discharges wastewater and sludge containing PFOA and PFOS from 3M's on-site wastewater treatment plant into the Tennessee River and the Dry Creek WWTP, doc. 1 at 8–9, in the absence of any controlling authority indicating that 3M's discharges fit within the cited exception to the RCRA's definition of "solid waste," the court must accept as true the Riverkeeper's well-pleaded factual allegations. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Consequently, the court finds that the Riverkeeper's allegations sufficiently plead that the groundwater and leachate at issue constitute solid waste. *See* 42 U.S.C. § 6903(27).

The court is also not persuaded by 3M's assertion that the Riverkeeper has failed to plead facts giving rise to a reasonable inference of "imminent and substantial endangerment" to health or the environment, *see* doc. 37 at 6. As the Riverkeeper points out, every document and agreement 3M cites in its defense "was crafted and executed *before* May 2016—when the EPA defined [even more] stringent limits on PFOA and PFOS." Doc. 43 at 12 (emphasis added). Moreover, the Riverkeeper sufficiently alleges that the levels of PFOA and PFOS in drinking water exceed current EPA advisory levels, and that exposure to these chemicals may cause serious long-term physiologic changes and various fatal illnesses. *See* doc. 1 at 10.

### C. The City's Motion

The City has also moved to dismiss based on lack of subject matter jurisdiction and failure to state a claim.

### 1. Subject matter jurisdiction

The Riverkeeper alleges that the City is violating the RCRA "through its owner-ship and operation of the Morgan County Landfill." Doc. 1 at 17. The City's motion rests on the permits it has to operate the landfill. Specifically, the City asserts that the ADEM issued it a Solid Waste Dispos-al Facility permit in 2012 ("Solid Waste Permit") and a State Indirect Discharge permit in 2016 ("SID Permit"), doc. 40 at 5 (citing docs. 40–1; 40–2), that the Solid Waste Permit "allows [it] to accept all solid waste classified as non-hazardous, includ-ing industrial waste, commercial waste and dried sludge, and directs [it] to collect and dispose of its leachate," *id.* at 4–5, and that the "SID Permit specifically authorizes the City to discharge leachate which contains PFC's …," with no limitations on the concentrations of PFCS, *id.* at 5, 11 (citing doc. 40–2 at 4). Also, the City points out that it has an NPDES permit, "which al-lows the WWTP to discharge PFOA and PFOS into the Tennessee River," [6] *see* doc. 40–3 at 6, and a Waste Certificate Permit "which allows the WWTP to dispose of its sludge into the Morgan County Landfill," doc. 40 at 5 (citing doc. 40–4). In other words, the City contends that the River-keeper cannot sue it for conduct for which it has authorization to perform.

These contentions fail because, first, the solid waste permit applies only to non-hazardous waste. *See* docs. 40 at 5; 40–4 at 7 (certification of an authorized represen-tative of the Dry Creek WWTP that the "waste [does not] exhibit[ ] a Hazardous Characteristic as defined by Federal and/or State regulations"). Moreover, sam-ples of the sludge used for the certifica-

tions do not appear to have included any testing for PFOA and PFOS. *See* doc. 40–4 at 10–11. Finally, the City fails to direct the court to any authority stating that a citizen cannot bring an RCRA claim to try to impose stricter limits on the disposal of hazardous waste than those imposed by an EPA–approved State permit or to supple-ment the terms of such a permit. For these reasons and the reasons explained in Part III.A.1, *supra*, the court declines to dismiss the Riverkeeper's claims for lack of subject matter jurisdiction on the basis of these permits.[7]

### 2. 12(b)(6) Arguments

The City also asserts that the Morgan County Landfill's leachate discharges and the leachate accepted at the Water Works Treatment Plant and discharged into the Tennessee River "do not meet the defini-tion of 'solid waste.'" Doc. 40 at 13. These contentions fail at this juncture for the same reasons explained in Part III.A.2, *supra*.

## IV. CONCLUSION AND ORDER

In light of all of the foregoing, the mo-tions to dismiss filed by BFI, doc. 28, 3M, doc. 36, and the City, doc. 39, are **DE-NIED**. The parties are **DIRECTED** to submit a Rule 26(f) report by February 24, 2017.

**DONE** the 10th day of February, 2017.

---

**6.** Although the NPDES permit states that the City's discharge of PFCs "shall be limited and monitored by the Permittee as specified be-low," the chart does not actually specify a limit on the discharge of PFCs. *See* doc. 40–3 at 6.

**7.** The City also urges the court to abstain under the primary jurisdiction doctrine and/or Burford abstention doctrine. Doc. 40 at 18–20. The court declines to do so. *See* Part III.B.1.b, *supra*.